[Civ. No. 31380. First Dist., Div. Three. Feb. 28, 1973.]

SAN FRANCISCO PLANNING AND URBAN RENEWAL
ASSOCIATION et al., Plaintiffs and Appellants, v.
CENTRAL PERMIT BUREAU et al., Defendants and Respondents;
SAN FRANCISCO CHATMAR ASSOCIATES,
Real Party in Interest and Respondent.

**COUNSEL**

Farella, Braun & Martel and Richard M. Bryan for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Louise H. Renne and E. Clement Shute, Deputy Attorneys General, James L. Weinberger, David M. Balabanian and Lucy Kelly McCabe as Amici Curiae on behalf of Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, Robert A. Kenealey and Burk E. Delventhal, Deputy City Attorneys, for Defendants and Respondents.

Thelen, Marrin, Johnson & Bridges, Peter Anderson, Jackson C. Stromberg and Thomas P. Devitt for Real Party in Interest and Respondent.

Martin & Flandrick and Robert Flandrick as Amicus Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

## Opinion

CALDECOTT, J.—This is an appeal from a judgment of the Superior Court of the City and County of San Francisco denying appellants San Francisco Planning and Urban Renewal Association and individual petitioners (hereinafter referred to as SPUR), a writ of mandate. Appellants sought an order revoking a permit the City and County of San Francisco had granted to the real party in interest San Francisco Chatmar Associates (Chatmar), for the construction of a highrise hotel.

On November 26, 1971, a petition for writ of mandate was filed in the Superior Court of the City and County of San Francisco by SPUR. The petitioner requested that the respondents City and County of San Francisco Central Permit Bureau, Planning Commission and Board of Permit Appeals (hereinafter Agencies) revoke a site permit granted to Chatmar Associates for construction of a Holiday Inn Hotel. The writ was requested on the ground that the proposed building violated the height and bulk limitation of the "Urban Design Plan." The petition was denied and judgment entered on December 13, 1971. The appeal is from the judgment.

On August 26, 1971, the city planning commission, by resolution, adopted, as an amendment to the Master Plan of the City and County of San Francisco, the "Urban Design Plan" which had been under study for several years. The plan was first published in May of 1971; public presentation had been made in May; and hearings held in July. On August 26, 1971, the city planning commission also adopted a resolution which declared its intention to reclassify property in accordance with the bulk and height limitation of the Urban Design Plan. Recognizing that additional study of the plan was necessary, the commission adopted for its guidance, until the board of supervisors enacted the proposed plan, an "outline of interim height and bulk controls." Approximately one year later, on July 31, 1972, the board of supervisors adopted the Urban Design Plan, and the ordinance was signed into law by the mayor on August 18, 1972.

On June 21, 1971, Chatmar filed a site permit application for a Holiday Inn at the corner of Pine Street and Van Ness Avenue in San Francisco. Chatmar had first informally approached the San Francisco Planning Department in the middle of 1969 with a proposed highrise hotel for that location. Chatmar purchased the land in November 1969 and in May 1970.

In July 1970, the planning department staff advised the developers that, although their amended proposal did not violate the existing zoning laws, it would not be in accord with the height and bulk restrictions of the forthcoming Urban Design Plan. The developers did not apply for a permit at that time and had no further contact with the planning department until one year later when they filed their application for a site permit. The developers stated that they had been engaged in obtaining financing during this period.

The site permit was not issued by the central permit bureau at the time the application was made, because the preliminary plans disclosed the building would greatly exceed the height and bulk guidelines of the Urban Design Plan. The application was then called up for a decision by the planning commission.[1]

At its regular meeting on September 16, 1971, the planning commission considered reports on the project, the effect of section 302(e) of the city Planning Code and the Urban Design Plan.

The record is clear that the plans submitted by Chatmar complied with the existing zoning laws. It is also clear that the plan differed substantially from the provisions of the Urban Design Plan, particularly as to the height and bulk of the building. At the hearing it was the director of planning's interpretation that the interim controls of August 26, 1971 did not apply to the Chatmar project.

At the hearing, witnesses, both for and against approval of the application for the permit, appeared. Those favoring the granting of the permit pointed out the economic benefits to the city to be derived from the project and those opposed spoke of the undesirable effects of the project on the residential character of the neighborhood and the unfortunate effect on the city because of its height and bulk. The planning commission approved the application. The permit was issued on October 14, 1971.

Appellants appealed to the permit appeals board which, in a de novo hearing on November 8, 1971, concurred in the planning commission's

---

[1]In San Francisco an application for a permit is first submitted to the central permit bureau. The bureau refers the application to the various city departments and agencies concerned and these agencies review and report whether the project complies with the Planning Code. Ordinarily, as long as the plans and specifications for the project are in conformity with the applicable ordinances, a permit is issued as a matter of course. However, the planning commission may invoke its discretionary power to review at a public hearing an application which nevertheless raises a significant question.

decision. No additional evidence was taken at this hearing. A request for rehearing was denied on November 22, 1971. On November 26, 1971, the petition for writ of mandate was filed in the superior court commencing the judicial procedures upon which this appeal is based.

The following are the issues raised on this appeal.

I.   Are the respondent zoning Agencies bound to apply the interim zoning controls in existence at the time of their respective hearings on the site permit application?

II.   Did the board of permit appeals fail to follow the procedures, prescribed by the Charter of the City and County of San Francisco for obtaining a variance from the zoning ordinance?

III.   Does the "Due Process" clause require that the board of permit appeals make findings of fact when exercising its appellate powers?

IV.   Are amendments to the Planning Code adopted subsequent to the final administrative agency's action binding upon the appellate court?

V.   Was an environmental impact report required in this case?

I

█   Are the respondent zoning Agencies bound to apply the interim zoning controls in existence at the time of their respective hearings on the site permit application?

Section 302(e) of the Planning Code of the City and County of San Francisco cited by appellants provides in part: "302(e) Effect upon permit applications. No application for a building permit . . . or for any other permit . . . for a new use of property, *filed subsequent to the day that* . . . a resolution of intention has been adopted for the reclassification of such property . . . shall be approved by the Department of City Planning while proceedings are pending on such reclassification . . . unless the construction and use proposed . . . would conform both to the existing classification of such property . . . and also to the different classification . . . under consideration in those proceedings; . . ." (Italics added.)

The basic contention of the appellants is that the respondent Agencies were required under section 302(e) to apply the interim zoning controls in effect at the time of their action and that the Agencies did not have discretion to disregard these controls merely because a site permit application was filed *before* the controls were enacted. This contention is repeated, in

various forms, throughout the appellants' argument as though the mere repetition of a false premise will endow it with credence.

We are unable to agree with appellants' interpretation of section 302(e). The wording of the section is clear. The section provides that no application for a building permit filed subsequent to the resolution of intention shall be approved. It is undisputed that the proposed building of Chatmar complied with the requirements of the existing zoning laws and in fact the plans were modified so that they would comply. The power and authority of the planning commission are set out in the city charter and the Planning Code. There is, however, in section 302(e), if certain conditions exist, a restriction on the power to issue a building permit. Those conditions are: (1) that a resolution of intention has been adopted by the planning commission and, (2) the application for the building permit was filed subsequent to the adoption of this resolution. Both conditions must be present. Here, there is no question that a resolution was adopted but it is equally clear that the application was filed prior to, not subsequent to, the date of adoption. Thus section 302(e) is not applicable. Appellants attempt to circumvent the provisions of this section by claiming there is an ambiguity in the section or that a loophole was intentionally created. However, the legislative history of the section shows that the board of supervisors was aware of the section and as recently as 1968 considered a proposed amendment to the section and refused to adopt it.

Appellants emphasize that public policy disfavors nonconforming uses. This is a correct statement of the law but appellants overlook the fact that at the time the permit was granted and for almost a year thereafter the law was not the proposed law that appellants refer to, but the existing Planning Code and Chatmar's proposed structure conformed to the existing law.

We will not discuss in detail the other arguments raised by appellants concerning section 302(e). Basically their position would require a rewriting of section 302(e) by this court to delete the requirement that the application for a permit be filed subsequent to the adoption of a resolution of intention. Appellants apparently would have the section provide that before approval an application must comply with both the existing law and the proposed changes. As previously stated this was not the intention of the section and the board of supervisors actually went out of its way to limit the effect of the section to "subsequent applications." If the intention were to apply it to all permits, prior and subsequent, this could have been accomplished by simply omitting a few words. This was not done.

Appellants claim that even if the Agencies had discretion to approve the application they were bound to follow the proposed Urban Design Plan as the standard upon which to base an exercise of discretion. This argument was raised in *City & County of S. F. v. Superior Court*, 53 Cal.2d 236, 252 [1 Cal.Rptr. 158, 347 P.2d 294], and the court stated that it was proper to follow the standard prescribed by the existing law, as was done in this case. The fact that the Agencies could use the proposed law as a standard, in certain situations, is immaterial here as they did not and were not required to do so.

Appellants maintain that the mere filing of an application under section 302(e) does not create a vested right in the permit. Neither respondents nor Chatmar claim that it does. Here, all the filing did was to exempt the application from the restriction of section 302(e); the vested right was a different matter. However, as respondents were exempt from the interim controls under section 302(e) the permit was legally issued. As the permit was legally issued and as substantial work was done under the permit after it became final and before the ordinance was amended, a vested right was obtained in the permit and future changes in the height and bulk limitations in the zoning laws would not affect it.

Appellants claim that the interim controls provided for in section 302(e) have been recognized by the California Supreme Court as a legitimate method of preventing the creation of nonconforming structures just prior to zoning laws. However, it is not necessary to misread section 302(e) to accomplish this. In *Russian Hill Improvement Assn. v. Board of Permit Appeals*, 66 Cal.2d 34 [56 Cal.Rptr. 672, 423 P.2d 824], the court pointed out that the rush for permits before a new zoning ordinance can be adopted is defeated by holding that the board of permit appeals applies the law in effect at the time of its approval. This would mean that in most cases the new zoning ordinance would become effective before the final administrative action on the permit had been completed. As the board of permit appeals applies the law in effect at the time of its approval, the last-minute permit applications would have to comply with the new law. In the present case the new law did not go into effect before the final administrative action because, as the planning commission stated, additional study and hearings on the proposal were necessary. In fact the new law did not become effective for over a year after Chatmar's application was filed. It is questionable if this could be termed a last-minute application, considering that it was filed a year before the law was amended.

## II

■ Did the board of permit appeals fail to follow the procedures, prescribed by the Charter of the City and County of San Francisco for obtaining a variance from the zoning ordinance?

Amicus curiae argues that although the proposed building complied with the zoning ordinances in effect at the time the site permit application was filed, that when the board of permit appeals heard and ruled on the petitioners' application, the interim limitations of the Urban Design Plan were in effect, and thus a variance would be required. The amicus curiae points out that under *Russian Hill Improvement Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d 34, 46, ". . . the Board of Permit Appeals in its de novo review is bound to apply the zoning ordinances in effect at the time of its final decision, not those in force at the time of preliminary proceedings before any subordinate agency." The fallacy of amicus curiae's argument lies in the fact that it assumes that this application was subject to the interim limitations of the Urban Design Plan. As we have stated above, the interim limitations did not apply to this application and the board of permit appeals properly applied the zoning ordinances in effect at the time of its decision. As the building complied with the requirements of those ordinances, a variance was not necessary and in fact could not have been granted by the administrative agency as a variance is granted only for an exception to the existing zoning code. Thus the question of a variance is not applicable to this case.

## III

■ Does the "Due Process" clause require that the board of permit appeals make findings of fact when exercising its appellate powers?

The amicus curiae contends that specific findings are required by the charter and Planning Code in cases such as the instant action in which the purport of the board's decision is to grant a variance.

As previously stated no variance was required in this case and none was granted. Furthermore, no provision of the charter or Planning Code has been cited that requires that findings be made. In fact, the court stated in *City & County of S. F.* v. *Superior Court, supra,* 53 Cal.2d 236, at page 241, footnote 2, "Neither the San Francisco charter nor related sections of the municipal code governing permit procedure provide for the making of any findings of fact by the central permit bureau on original applications or by the board of permit appeals." The three cases cited by amicus curiae

are of no help. *California Motor Transport Co.* v. *Public Utilities Com.,* 59 Cal.2d 270 [28 Cal.Rptr. 868, 379 P.2d 324] and *May-Day Realty Corporation* v. *Board of Appeals* (1970) 107 R.I. 235 [267 A.2d 400], are based on specific code sections that require findings of fact to support a decision. As stated above, there is no such legislative requirement affecting the Agencies here concerned. In the third case cited, *Goldberg* v. *Kelly,* 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], the court stressed the grave consequences of the termination of the only means of livelihood of a welfare recipient and the necessity of due process protection at the initial termination hearing. The court stated at page 271 [25 L.Ed.2d at p. 301], ". . . the decision maker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing. [Citations.] To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on [citation], though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." The court distinguished termination of welfare payments from "the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are included." As the court pointed out it required a statement of the reasons, not formal findings of fact, for the administrative agency decision to insure, in welfare payment cases, that the decision rested solely on legal rules and evidence adduced at the hearing. There is no indication in *Goldberg,* in fact the indication is to the contrary, that findings of fact would be required of an administrative agency in a zoning hearing.

## IV

Are amendments to the Planning Code adopted subsequent to the final administrative agency's action binding upon the appellate court?

Appellants maintain that where there is a change in statutory law during a mandamus proceeding or an appeal therefrom, the appellate court must apply the law in effect at the time of its decision, citing *City & County of S. F.* v. *Budde,* 139 Cal.App.2d 10 [292 P.2d 955, 294 P.2d 503], and *Renken* v. *Compton City School Dist.,* 207 Cal.App.2d 106 [24 Cal.Rptr. 347]. Appellants point out that this rule has been held applicable in zoning matters, citing *Wheat* v. *Barrett,* 210 Cal. 193 [290 P. 1033] and *West Coast Advertising Co.* v. *City & County of San Francisco,* 256 Cal.App.2d 357 [64 Cal.Rptr. 94]. Appellants further contend, in the instant case, that

section 150(d) of the San Francisco Planning Code[2] does not create an exception to this principle of administrative law because section 150(d) is not applicable until the permit is "lawfully granted" and a permit is not "lawfully granted" until a final decision is made in the review process, which includes judicial review. This contention is without merit. *Russian Hill Improvement Assn.* v. *Board of Permit Appeals, supra,* at page 43, held that a permit is lawfully granted as of the date of completion of all administrative action. Thus section 150(d) is controlling here and the subsequent amendments to the Planning Code are not applicable.

The two cases cited by appellant, *Wheat* v. *Barrett, supra,* 210 Cal. 193 and *West Coast Advertising Co.* v. *City & County of San Francisco, supra,* 256 Cal.App.2d 357, are distinguishable. In each of these cases the permit had not been issued, the proposed structure did not conform to the law, and no construction had been commenced. The court in the mandamus action did not compel the issuance of a permit for a structure that did not comply with the law. In the present case, the proposed building did comply with existing law.

Respondents also point out that even if this court were bound by the Planning Code as amended, sections 302(f) and 302(g) continue the immunity to revocation of their lawfully granted permits established by section 150(d). However, as previously stated, the amendments to the code, including these two sections do not apply here.

V

█ Was an environmental impact report required in this case?

Appellants further contend that the respondent Agencies failed to require an environmental impact report pursuant to the provisions of the Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and cites *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049] in support of this contention. The December 5, 1972, amendments to the Environmental Quality Act (§§ 21065, 21169, 21170 and 21171) are dispositive of this issue. The recently enacted amendments state: "21169. Any project defined in subdivision (c) of Section 21065

---

[2]Planning Code section 150(d) provides: "[A]ny building or use for which a permit has been lawfully granted *prior to* the effective date of an amendment to the City Planning Code . . . may be completed and used in accordance with the approved plans, provided that construction is started and diligently prosecuted to completion . . . , and such building or use shall thereafter be deemed to be a lawfully existing building or use." (Italics added.) This section has subsequently been renumbered and amended.

undertaken, carried out or approved on or before the effective date of this section and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before the effective date of this section notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective. . . . 21170. (a) Section 21169 shall not operate to confirm, validate or give legal effect to any project the legality of which was being contested in a judicial proceeding in which proceeding the pleadings, prior to the effective date of this section, alleged facts constituting a cause of action for, or raised the issue of, a violation of this division and which was pending and undetermined on the effective date of this section; provided, however, that Section 21169 shall operate to confirm, validate or give legal effect to any project to which this subdivision applies if, prior to the commencement of judicial proceedings and in good faith and in reliance upon the issuance by a public agency of any lease, permit, license, certificate or other entitlement for use, substantial construction has been performed and substantial liabilities for construction and necessary materials have been incurred."

The permit for the construction was issued prior to the effective date of the amendments and the pleadings in this action do not allege facts constituting a cause of action or raise the issue of the Environmental Quality Act. The requirements of the act therefor are not now applicable in this case.

The judgment is affirmed.

Draper, P. J., concurred.

## OPINION

**BROWN (H. C.), J.**—I dissent.

I agree with the majority of this court in their determination of all the issues which they considered. I would reverse on a further ground raised by appellants, that the Agencies abused their discretion in granting the permit to Chatmar.

The San Francisco Planning Commission and Board of Permit Appeals are vested with discretionary authority to deny a permit for a building although the building meets the requirements of the Planning Code and city charter.[1] (See *Lindell Co.* v. *Board of Permit Appeals*, 23 Cal.2d 303

[1]The City Attorney of San Francisco has expressed his opinion to this effect reasoning that the commission could not fulfill its function under the Municipal Code

[144 P.2d 4].) As the Chatmar application for a permit conformed to existing codes but was in violation of the Urban Design Plan which plan had been adopted by the planning commission (and was under consideration by the San Francisco Board of Supervisors), the matter was calendared for a hearing before the planning commission to determine in its discretion whether the permit should be granted or denied.[2]

In considering the question of whether the Agencies abused their discretion in granting the permit to Chatmar, it is recognized that " 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.' " (*Lindell Co.* v. *Board of Permit Appeals, supra,* at p. 315, quoting from *Maxwell* v. *Civil Service Commission,* 169 Cal. 336, 339 [146 P. 869].) It is also clear, however, that this discretion to be valid must be controlled by ascertainable standards. (*In re Schillaci,* 196 Cal.App.2d 591, 595 [16 Cal.Rptr. 757].)

The standards which guide the Agencies in their consideration of all permits has been discussed in *City & County of S. F.* v. *Superior Court,* 53 Cal.2d 236, 250 [1 Cal.Rptr. 158, 347 P.2d 294], where it said: "The overall standard laid down for guidance of the planning commission in passing on building permit applications is thus that of 'promotion of the public health, safety, comfort, convenience and general welfare,' in the light of existing and effective city ordinances prescribing express or mini-

---

without such discretion: "If these provisions were exclusive it is clear that the Planning Commission's consideration would necessarily be limited to a mechanical measuring of application against prescribed standards, in this case the zoning ordinances. As a practical matter, a clerk in the Central Permit Bureau could more expeditiously perform the routine. The ordinances contemplate no such pro forma consideration. Section 26 of the permit procedure regulation defines the scope of action as follows: 'In the granting or denying of any permit, or the revoking or refusing to revoke any permit, the granting or revoking power *may take into consideration the effect of the proposed business or calling upon surrounding property and upon its residents, and inhabitants thereof; and in granting or denying said permit,* or revoking or refusing to revoke a permit, *may exercise its sound discretion* as to whether said permit should be granted, transferred, denied or revoked.' (S.F. Municipal Code, Part III, Art. 1, Sec. 26.) As stated in the *Lindell* case, 'This comprehensive language affecting the issuance of *all* permits sought under authority of the relevant San Francisco Charter and ordinance provisions in plain terms vests the granting power with a "sound discretion" generally.' " (Powers of City Planning Commission Etc. (1954) Opn. 845 by City Atty. of S.F.)

[2]The minutes of the meeting of the planning commission on September 16, 1971, state that the application was to be considered under its *"power of discretionary review"* as the application "was filed on June 21, 1971, well before the effective date of the interim height and bulk control . . . resolution."

mum standards." As the Supreme Court made clear, the standards may be found in the body of "the relevant law—whether enunciated by Constitution, statute, charter, ordinance, or controlling court decisions—and a lawful discretion, applied to the facts in evidence."

The growing public concern about the quality of our natural environment has led to both legislative activity and a closer observance by the courts of the actions of administrative bodies when their decisions relate to fundamental interests of daily life, health, aesthetics and liberties.[3] As one writer has observed: "An agency is not an island entire of itself. . . . The very subordination of the agency to judicial jurisdiction is intended to proclaim the premise that each agency is to be brought into harmony with the totality of the law; . . . " (Jaffe, Judicial Control of Administrative Action (1965) p. 590.)

I thus start with three premises: (1) that the administrative authorities are invested with and have the duty to exercise discretionary power in determining whether to deny or grant a building permit; (2) that in the exercise of this discretion, the administrative agencies must follow ascertainable standards or guidelines; and (3) that it is a function of the courts to determine whether the administrative agencies followed those ascertainable standards or guidelines.

My conclusion that ascertainable standards were ignored by the Agencies requires reference to the facts presented to those bodies at the hearing on

---

[3]In *Environmental Defense Fund, Inc.* v. *Ruckelshaus*, 439 F.2d 584, 597-598, the court said: "We stand on the threshold of a new era in the history of the long and fruitful collaboration of administrative agencies and reviewing courts. For many years, courts have treated administrative policy decisions with great deference, confining judicial attention primarily to matters of procedure. On matters of substance, the courts regularly upheld agency action, with a nod in the direction of the 'substantial evidence' test, and a bow to the mysteries of administrative expertise. Courts occasionally asserted, but less often exercised, the power to set aside agency action on the ground that an impermissible factor had entered into the decision, or a crucial factor had not been considered. Gradually, however, that power has come into more frequent use, and with it, the requirement that administrators articulate the factors on which they base their decisions.

"To protect these interests from administrative arbitrariness, it is necessary, but not sufficient, to insist on strict judicial scrutiny of administrative action. For judicial review alone can correct only the most egregious abuses. Judicial review must operate to ensure that the administrative process itself will confine and control the exercise of discretion. Courts should require administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible. . . ." (See also *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402 [28 L.Ed.2d 136, 91 S.Ct. 814].)

Chatmar's application. Some repetition of matters set forth in the majority opinion is unavoidable.

On August 26, 1971, the city planning commission, by resolution, adopted the Urban Design Plan[4] which represented the culmination of a study first undertaken in the fall of 1968. The plan had first been published in May of 1971; public presentation had been made in May; and hearings held in July. Also on August 26, 1971, the city planning commission passed a resolution which declared its intention to reclassify property in accordance with the bulk and height limitations of the Urban Design Plan, adopted for its guidance an Outline of Interim Height and Bulk Controls, and provided that its declaration of intention and the controls and procedures should remain in effect until the effective date of permanent citywide height and bulk controls enacted by the board of supervisors pursuant to the Urban Design Plan.[5] The Outline of Interim Height and Bulk

---

[4]The planning commission's resolution No. 6746 adopting the Urban Design Plan provides:

"WHEREAS, The height and bulk of new development are matters of significant concern to the San Francisco community;

WHEREAS, These concerns are reflected and emphasized in the document entitled, 'The Urban Design Plan for the Comprehensive Plan of San Francisco,' published in May 1971 after extensive study;

WHEREAS, Said Urban Design Plan was the subject of public hearings and was adopted by the City Planning Commission as a part of the Master Plan of the City and County of San Francisco on August 26, 1971, by Resolution No. 6745;

WHEREAS, Due to the intense interest in questions concerning the height and bulk of buildings, the Planning Commission desires to give high priority to the implementation of the portion of the Urban Design Plan pertaining to Major New Development, and most specifically the guidelines for height and bulk of buildings; and

WHEREAS, Enactment of permanent standards and controls for height and bulk of buildings on a citywide basis can occur only after more detailed study and after a period of public hearings and consideration;

WHEREAS, In the interim there is a strong need for controls that will regulate the form of construction and prevent violation of the policies of the Urban Design Plan pertaining to height and bulk;

THEREFORE BE IT RESOLVED, That the City Planning Commission does hereby declare its intention to reclassify property throughout the City and County of San Francisco, and amend the text and maps of the City Planning Code, by extension and creation of districts for the control of height and bulk, pursuant to the maps in the Urban Design Plan . . . ;

. . . . . . . . . . . . . . . . .

AND BE IT FURTHER RESOLVED, That this declaration of intention and the controls and procedures hereunder shall remain in effect, unless modified by further resolution of this Commission, until the effective date of permanent citywide height and bulk controls enacted by the Board of Supervisors pursuant to the Urban Design Plan;"

[5]The permanent controls were effective in August 1972.

Controls contains the following language: "The Planning Commission may permit a height within the range specified, *but in no event and under no circumstances shall it or any appeal agency permit a height greater than that specified in the map legend as the 'Maximum Height That May Be Permitted by City Planning Commission After Review.'* " (Italics added.)

In the area of Van Ness in San Francisco, where Chatmar proposed to build, the plan imposes a height limit of 88 feet unless specific approval is given by the planning commission, in which case, the maximum allowable height is 160 feet. As to buildings with a maximum permissible height of 160 feet, the plan prohibits the construction of buildings exceeding 110 feet in the plan dimension or 125 feet in the diagonal dimension.

Chatmar's site permit was not issued at the time the application was made but, because the preliminary plans disclosed that the building would greatly exceed the height and bulk guidelines for Van Ness Avenue and Pine Street, as set forth in the Urban Design Plan, the application was called up for a *discretionary decision* by the planning commission. In its regular meeting on September 16, 1971, the planning commission considered reports on the project.

After a general report on the project was given, Allan B. Jacobs, director of planning, read a statement explaining the decision of the department to recommend disapproval of the application.[6] The statement noted "the

---

[6]After indicating that the project did not come directly under the interim controls put into effect on August 26, the statement continued as follows:

"In a review of this building under the Commission's normal discretionary power, *it is the Staff's view that the building would nonetheless have extremely unfortunate effects upon the City.* It would present a bulky, slab-like structure of considerable height in an area of the City traditionally kept free of tall buildings, with the result that the valley between two hills would disappear from the San Francisco skyline. With the pattern thus broken, other tall buildings would be likely to follow, and the height limits proposed for this whole part of the City could become meaningless. It is precisely this type of building that the Urban Design Plan guidelines were drawn up to prevent.

"This is an unfortunate case in which most of the decisions in designing of the building have become foregone conclusions because of standardized arrangements and building economics dictated by a National Central Office, without taking account of the individual City for which the building is intended. The developers have tried, within their many constraints, to moderate the design, but without significant success. They have not been able to alter the height and bulk in a major way, and even the exterior materials and finishes come from a national mold based on economic considerations.

"The Department's concerns were expressed to the developers' architect in the contacts during the first half of 1970. If there had been further contacts later in 1970 or early in 1971, these concerns would have been re-expressed and further

extreme differences between the plans proposed, especially in the height and bulk of the building, and the guidelines and objectives of the Urban Design Plan."

Various witnesses then presented their views on the wisdom of approving the application. Persons representing labor unions, hotel and other business associations advocated approval on the ground that the project would create jobs and improve business. Opponents of the project stressed the fact that the building was out of scale with the neighborhood, would have an undesirable effect on the quality of life of the neighborhood, would jeopardize the residential character of the neighborhood and was intrinsically ugly. The application was thereafter approved in a four-to-three vote.[7]

Appellants appealed to the board of permit appeals, which, in a de novo hearing November 8, 1971, concurred in the planning commission's decision. No additional evidence was taken at this hearing and the argument concentrated upon the economic gain to the city in the form of jobs which would result from the construction. On November 26, 1971, after denial of request for rehearing, the petition for writ of mandate was filed in the superior court. The petition was denied and this appeal followed.

The majority opinion correctly interprets section 302(e) of the Planning Code as a *mandatory* interim control *only* as to those applications for permits "filed subsequent to the day that . . . a resolution of intention has been adopted for the reclassification of such property . . ." The planning commission, however, under its discretionary powers, had the authority to invoke the interim controls under its resolution of August 26, 1971.

The purpose of interim controls on permits during pendency of new zoning ordinances has been recognized in other jurisdictions as the protection of the public interest and welfare. Thus, the court in *Downham v. City Council of Alexandria,* 58 F.2d 784, 788, noted: "Otherwise, any movement by the governing body of a city to zone would, no doubt, frequently precipitate a race of diligence between property owners, and the adoption later of the zoning ordinance would in many instances be without

---

emphasized. The building application was filed a month later [*sic*] the publication of the finished Urban Design Plan, and its contradiction of the plan is very apparent. Under these circumstances, I can see no alternative to a recommendation of disapproval of this application." (Italics added.)

[7]The commissioners then made statements indicating the trend of their thinking. Commissioner James J. Finn dealt with the "legal authority under which the Commission could act on the subject authority" and stated "that no administrative or legislative body may take action adopting and applying new legislation to a matter currently pending before it."

effect to protect residential communities—like locking the stable after the horse is stolen." (See generally 34 Notre Dame Law. 109.)

"Discretion is the power . . . to make a choice among competing considerations." (Jaffe, Judicial Control of Administrative Action, *supra*, p. 181.) It is my opinion that the Agencies in not considering proper factors of choice abused the discretionary power vested in them. Those factors of choice which were not considered included: (1) The purposes of the Urban Design Plan, a plan which the planning commission itself had recommended to the San Francisco Board of Supervisors to be enacted into law; (2) The commission's resolution for interim controls pending consideration and adoption of the Urban Design Plan by the San Francisco Board of Supervisors; (3) The purpose of section 302(e) of the Planning Code; (4) The provisions of section 101 of the Planning Code setting forth the purposes of the code; (5) The standards for permitting a variance to limitations on height and bulk of buildings in given areas in San Francisco; and (6) The legislative policy of environmental protection.

Each of the above factors or standards will be discussed seriatim.

*First:* The Urban Design Plan was the culmination of several years' study by the staff of the planning commission and was accepted by the commission as a master plan for city development. The record of the meeting of the planning commission, as disclosed by its complete minutes, discloses no evidence that the proposed structure would further the goals of the plan or even that it would not interfere in a significant way with the plan. The staff of the planning commission, to the contrary, reported to the commission that Chatmar's structure was "precisely [the] type of building that the Urban Design Plan was drawn to prevent," and that the building, by breaking the height pattern planned by the Urban Design Plan, would make the "height limits proposed for this whole part of the City . . . meaningless." There was no evidence to dispute this report.

*Second:* On August 26, 1971, when the planning commission adopted the Urban Design Plan, it also adopted a resolution for controlling the construction of buildings pending the adoption of that plan by the San Francisco Board of Supervisors. The language used in this resolution was unambiguous and emphatic, "in no event and under no circumstances shall it or any appeals agency permit a height greater than specified."

The resolution quoted above, in effect, established the Urban Design Plan as "interim controls" from the effective date of the resolution and

should have functioned as an "ascertainable standard" in guiding the Agencies' discretion.

It is obvious that vested rights are not created simply by the filing of an application for a building permit. A construction vesting such a right would be contrary to the discretionary power reposed in agencies to deny permits which conformed to antiquated standards. (See 34 Notre Dame Law., *supra*, at p. 110 et seq.; Powers of City Planning Commission Etc., *supra*, (1954) Opn. 845 by City Atty. of S. F.)

The record of the proceedings before the Agencies discloses no reasonable basis for disregarding the commission's own resolution for interim controls.

*Third:* Section 302 of the Planning Code concerns amendments to the code. After subsections providing for the initiation of amendments, approval by the planning commission, and adoption by the board of supervisors, subsection (e) provides that the planning commission must require developers to design to the new standards even prior to the final adoption by the board.[8] While the Agencies were not bound in the instant case to apply the "interim controls" of section 302(e), because the section is worded to apply to applications "filed subsequent" to the filing of the resolution of intention, it would appear only reasonable that the Agencies should be guided by the purposes of that provision of the Planning Code.

The purpose of the section is to prevent thwarting the new standards before they can take effect and to prevent an ill-considered race for permits under an antiquated or superseded code.[9] A construction of the code which

---

[8]Subsection (e) provides in relevant part as follows:

"(e) Effect upon permit applications. No application for a building permit . . . or for any other permit . . . for a new use of property, *filed subsequent to the day that* . . . a resolution of intention has been adopted for the reclassification of such property . . . shall be approved by the Department of City Planning while proceedings are pending on such reclassification . . . unless the construction and use proposed . . . would conform both to the existing classification of such property . . . and also to the different classification . . . under consideration in those proceedings; . . ." (Italics added.)

[9]The explanation of the section given to the planning commission by the director of planning to aid the commissioners in their consideration of a proposal to repeal section 305.5 of the Planning Code, the predecessor of 302(e), sets forth the purpose of the section.

*"Purpose of the Provision*

"The basic reason for provisions such as Section 305.5 is the fact that zoning classifications throughout the city reflect important public policy, and that this policy must not be thwarted where a new classification is sought to be enacted. Reclassifica-

would require approval of permits not conforming with interim controls solely on the ground that the applications had been *filed* would circumvent its very purposes. Since public presentation may precede the resolution of intention, as it did here, the race for permits is merely shifted in time. Granting such an advantage upon the mere filing of an application is also contrary to certain principles enunciated in the case of *Russian Hill Improvement Assn.* v. *Board of Permit Appeals,* 66 Cal.2d 34 [56 Cal.Rptr. 672, 423 P.2d 824], where our Supreme Court observed: "We have long held that one who is not yet armed with a presently effective municipal license to proceed with construction must assume the risk that, 'before final action [has] been taken on [his] application' [citation], the law might be changed so as to require that his application be denied." (66 Cal.2d at p. 40.)

In the *Russian Hill* case, the court also noted that the halt to "proliferation of nonconforming structures" and the prevention of circumvention of changes in the zoning laws were objectives "vital to the achievement of order in the volatile development of modern urban centers." (66 Cal.2d at p. 46.)

Section 302(e) in conjunction with the planning commission's own resolution of intention together set forth a strong policy preference for conformation with the Urban Design Plan. There was no evidence which would warrant the disregard of this policy preference such as evidence that the developer designed in reliance upon assurances of approval from the department of planning. Rather, there was evidence that no assurances were made and that the developer had not even been in touch with the depart-

---

tion is not an action lightly taken, and it is normally based upon changed conditions which render the old zoning inappropriate; new zoning is proposed because it *is* appropriate for the area and for the city.

"If the building permits may be freely approved under the old standards while adoption of the new ones is pending, there tends to be evasion of the new standards through efforts to delay final legislative action and through a race for permits before the effective date. In addition to undercutting the public policy on which the reclassification is based, this procedure may cause administrative burdens due to unmeritorious applications, and it may have an unhealthy effect upon building design and financing if these are neglected in the rush. In addition, the permit race may result in creation of uses which will become non-conforming even before they are in operation and thus subject to mandatory removal after a period of years.

"Under the system of permit approvals in San Francisco, only a few of the drawings for a building need be submitted for an approval to be received. Nevertheless, this 'site permit' usually constitutes a full approval for Planning Code purposes. This will aid the developer in his race against the effective date of a reclassification. Lack of further steps before the effective date would probably be justification for revocation of the site permit by the City, but whether this would in fact happen in individual cases is questionable, and it is likely that such cases would be litigated if a revocation occurred, at considerable cost to all parties concerned."

ment for approximately a year before the application was filed. The department had assumed that the plan to develop the property had been dropped.

*Fourth:* Section 101 of the Planning Code specifically sets forth guidelines for the actions of the planning commission in passing upon building permits. (*City & County of S. F.* v. *Superior Court, supra,* 53 Cal.2d 236, 250.) This section sets forth an overall standard in terms of promotion of the "public health, safety, peace, morals, comfort, convenience and general welfare" and specifies urban environmental factors to be considered.[10]

The evidence submitted by the planning staff and various citizens clearly indicates that the proposed structure would have a detrimental effect on the environment and upon the character of the surrounding residential area. There was no significant evidence that would warrant a finding that the building was so emphatically necessary to the general welfare of the city that the environmental detriments would be overcome or offset. The evidence in favor of the building centered around the possibility that its construction would create additional jobs. While the importance of creating employment opportunities is not to be minimized, it should not be the sole motivating reason in passing upon permits. It must be recognized that any building project, even though totally objectionable, would create jobs.

It is concluded therefore that the Agencies, in according great weight to a single factor and failing to take into account other highly important relevant factors, abused their discretionary powers.

*Fifth:* I am also convinced that the standards relating to variances[11]

---

[10]"Sec. 101. *Purposes.* This City Planning Code is adopted to promote and protect public health, safety, peace, morals, comfort, convenience and general welfare, and for the following more particularly specified purposes:

(a) To guide, control and regulate future growth and development in accordance with the Master Plan of the City and County of San Francisco;

(b) To protect the character and stability of residential, commercial and industrial areas within the City and to promote the orderly and beneficial development of such areas;

(c) To provide adequate light, air, privacy and convenience of access to property, and to secure safety from fire and other dangers;

(d) To prevent overcrowding the land and undue congestion of population;

(e) To regulate the location of buildings and the use of buildings and land adjacent to streets and thoroughfares, in such manner as to obviate the danger to public safety caused by undue interference with existing or prospective traffic movements on such streets and thoroughfares."

[11]The standards for the granting of a variance are set forth in section 305 of the Planning Code which provides that no variance may be granted unless facts exist sufficient to establish the following:

"1. That there are exceptional or extraordinary circumstances applying to the prop-

were applicable standards for guidance of the Agencies' discretion. If an application to the city is *in essence* an application for a variance, despite its denomination as something else, it should be processed as an application for a variance. (*City and County of San Francisco* v. *Padilla,* 23 Cal.App.3d 388, 401 [100 Cal.Rptr. 223].)

Although Chatmar's application was not technically a request for a variance, it must be conceded that the permit was in effect a variance as it created a nonconforming use.

The guidelines for a variance as set forth in the Planning Code were not discussed at the hearing. No inquiry was made to determine whether this variance from the master plan would be in harmony with the general purpose of the Planning Code, nor was there any evidence of exceptional circumstances to justify a variance.

*Sixth:* Finally, environmental factors should have been given consideration. While I have joined with the majority of this court in its opinion that an environmental report was not required under the *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049] decision because of a legislative moratorium, it is quite obvious from the federal and state enactments that environmental considerations are of utmost importance. (See 24 Stan.L.Rev. pp. 1117-1118.)

The Urban Design Plan as adopted by the planning commission, and as later enacted into law, is in fact an environmental plan for the protection of the health and safety of the public. The record before the Agencies is completely devoid of any evidence disclosing a consideration of the environmental impact which would be created by the proposed structure, except the adverse report of the planning commission staff to which I have previously alluded.

erty involved or to the intended use of the property that do not apply generally to other property or uses in the same class of district;

"2. That owing to such exceptional or extraordinary circumstances the literal enforcement of specified provisions of this Code would result in practical difficulty or unnecessary hardship not created by or attributable to the applicant or the owner of the property;

"3. That such variance is necessary for the preservation and enjoyment of a substantial property right of the subject property, possessed by other property in the same class of district;

"4. That the granting of such variance will not be materially detrimental to the public welfare or materially injurious to the property or improvements in the vicinity; and

"5. That the granting of such variance will be in harmony with the general purpose and intent of this Code and will not adversely affect the Master Plan."

For the above reasons, it appears to me that the Agencies' actions were limited to a mechanical measuring of the contents of Chatmar's application to determine if the petition could be said to comply with an antiquated code because of the dubious possibility that the existence of another high-rise hotel would create jobs. I have concluded that the Agencies had a duty to determine whether this proposed structure was in the interest of the public health, safety, convenience and general welfare. They failed to make such inquiry and arbitrarily refused to follow established guidelines and their failure constitutes an abuse of discretion.

It is true that Chatmar, after denial by the trial court of a writ of mandate revoking the permit, proceeded with construction of its hotel. But by doing so, it acquired no vested interest in the necessary building permit. *The trial court, in denying appellant's request to stay construction, cautioned Chatmar that it would proceed with construction with full notice of the possibility of an adverse decision on appeal.*

For the reasons herein set forth, I would direct that the writ of mandamus revoking the permit issue.

Petitions for a rehearing were denied March 30, 1973. Brown (H. C.), J., was of the opinion that the petition should be granted. Appellants' petition for a hearing by the Supreme Court was denied April 25, 1973.