[Civ. No. 2200. Fifth Dist. June 14, 1974.]

THE PEOPLE, Petitioner, v.
COUNTY OF KERN et al., Respondents;
L. G. KENDALL et al., Real Parties in Interest.

**COUNSEL**

Evelle J. Younger, Attorney General, Robert H. O'Brien, Assistant Attorney General, and Larry C. King, Deputy Attorney General, for Petitioner.

Ralph B. Jordan, County Counsel, and D. N. Reid, Assistant County Counsel, for Respondent.

Donald G. Kendall for Real Parties in Interest.

**OPINION**

**FRANSON, J.—**

STATEMENT OF THE CASE

On November 2, 1973, the Attorney General, pursuant to his environmental protection powers under Government Code section 12600 et seq.,[1] filed an action in the superior court against the County of Kern, hereinafter "County," and real parties in interest, hereinafter "Eastco," seeking to enjoin the County from issuing any building permits or otherwise allowing Eastco to commence construction of the Rancho El Contento subdivision, hereinafter "project," and to require the County to prepare an adequate environmental impact report, hereinafter "EIR," in connection with the project. On December 11, after a hearing, the trial court denied a preliminary injunction; the Attorney General filed a timely notice of appeal from this ruling. On February 1, 1974, the Attorney General filed the instant petition for a writ of mandamus and/or supersedeas. On February 21, 1974, we issued an order to show cause and directed the trial court to issue a restraining order enjoining the County and Eastco from issuing any permits or taking any action which would allow construction of the project pending further order of this court. On February 25 the trial court issued the restraining order.

Petitioner alleges that on October 1, 1973, the County granted an amendment to the zoning ordinance to allow Eastco to proceed with construction of the project without first complying with the requirements of the California Environmental Quality Act of 1970 (Pub. Resources Code, § 21000 et seq.), hereinafter "CEQA," and the Guidelines for Implementation of the CEQA (Cal. Admin. Code, tit. 14, § 15000 et seq.), hereinafter, "guidelines."[2] Specifically, it is alleged that the County failed to properly evaluate and respond to the comments and objections to the draft EIR as required by section 15146 of the guidelines.

Rancho El Contento is a proposed subdivision identified as Tract Nos. 3590 and 3591 in Kern County, consisting of 356 lots situated on 275 acres in the Cuddy Valley in the Los Padres National Forest. The valley

---

[1]See generally Wagoner, *Environmental Protection in California: Court Action Powers of State and Local Government Attorneys* (1974) 14 Santa Clara Law. 296.)

[2]See Register 73, No. 6—2-10-73. Certain minor amendments to these guidelines have been adopted since the enactment of the challenged ordinance. Although these amendments are not effective for purposes of this proceeding, they may be applicable to future actions taken by the County with respect to the project.

lies at an elevation of 5,300 to 6,000 feet and is surrounded by mountains of up to 7,500 feet. The native vegetation includes annual grasses, pine trees, manzanita and junipers, and numerous species of wild animals inhabit the area. The valley is currently devoted almost exclusively to recreational purposes with a small number of permanent residents.

Petitioner alleges that the development of the project will have a major adverse effect on the environment of Cuddy Valley, particularly as to regional water quality, basin air pollution, endangered species such as the California condor, access problems due to limited roads, adequate water supply and seismic problems from the San Andreas Fault. It is further alleged that the project will adversely affect several nonprofit organizations such as the San Fernando Girl Scout Council, the Southern California District Pentecostal Church of God and the American Baptist Churches of the Pacific Southwest, which operate camps for children and adults from the Los Angeles area which are situated immediately adjacent to the location of the project. It is asserted that the project will completely surround a one-acre parcel of land owned by the Girl Scouts on which their well, which supplies 100 percent of their water, is located.

In response to the petition, the County and Eastco make three basic contentions: First, that Eastco had a vested right to the zoning change on October 1, 1973, by reason of a tentative map approval of the subdivision on May 15, 1972, and the adoption of a specific plan for the development of Cuddy Valley on October 17, 1972; as a consequence the County cannot exercise its police power to deprive Eastco of its right to commence construction of the project. Second, that under the validating provisions of CEQA (Pub. Resources Code, § 21169, effective Dec. 5, 1972), the project having been undertaken and approved by the approval of the tentative map and the adoption of the specific plan, became legally effective notwithstanding the failure to comply with the CEQA and its EIR requirements. And third, that if the project was not exempt from the requirements of CEQA, the final EIR as adopted by the board of supervisors on October 1, 1973, fully complied with the law.

FACTS

In September 1971 Eastco acquired title to the subject property for development of a mountain subdivision. The property was zoned "A-1" (Light Agricultural).[3] On May 15, 1972, tentative subdivision maps for

[3] Under section 7161 of the Kern County Zoning Ordinance, the A-1 zone permits "any use permitted in the R-1 zone." Under sections 7021 and 7026 of the Zoning Ordinance, an R-1 zone is a one-family dwelling zone with a minimum lot area per dwelling of 6,000 square feet.

Tract Nos. 3590 and 3591 were approved subject, among other conditions, to the adoption of a specific plan for the development of Cuddy Valley and to Eastco's obtaining a zone change of the property from A-1 to E-1 and E-3 "Estate" zones, in order to establish a larger minimum lot size to control population density, apparently as required under the county ordinances for mountain subdivisions.[4] Thereafter, Eastco submitted a specific plan for the development of Cuddy Valley and applied to the County for rezoning to conform with the tentative maps. A specific plan was approved by the planning commission on September 5, 1972, and adopted by the board of supervisors on October 17, 1972. The plan called for minimum lot sizes of 14,000 square feet, and the board's approval expressly provided that "amendments to the Zoning Ordinance applicable to the area shall conform to this specific plan" in accordance with the tentative maps on file.

On April 17, 1973, the County ordered Eastco to file an EIR in connection with its application for rezoning.[5] About May 8, 1973, a nine-page draft EIR prepared on behalf of Eastco by French & Associates, civil engineers, was filed with the County planning department. The draft EIR generally complies with the CEQA and its guidelines for such reports. Subsequently, the County prepared a four-page addendum to the draft EIR which listed the adverse environmental effects "which cannot be avoided if the proposal is implemented." The report was circulated to interested public agencies and private groups. (See Pub. Resources Code, §§ 21104, 21105, 21153; Cal. Admin. Code, tit. 14, §§ 15085, 15160 et seq.)

---

[4]Under the County Zoning Ordinance an "E" (Estate) zone is a single-family dwelling zone with the same regulations as the R-1 zone except that as to an E-1 zone, the minimum lot area shall be 12,000 square feet (§ 7070, Land Use Zoning Ordinance, County of Kern), and as to an E-3 zone, the minimum lot area shall be 24,000 square feet (§ 7090, Land Use Zoning Ordinance, County of Kern).

[5]By letter of April 17, 1973, to French & Associates, civil engineers employed by Eastco, the county planning director advised that the project "may have a significant effect on the human or natural environment, and an environmental impact report (EIR) is, therefore, required." The letter states: "An examination of the wording of the 'Guidelines for Implementation of the . . . Act of 1970', particularly Section 15070(e), [ongoing project], would further substantiate our position that an EIR be required. The zone change you request, in our opinion, involves 'a greater degree of responsibility and control' over your project than did the Specific Plan or Tentative Tract approvals . . . . The zoning approval which you request after April 5, 1973, appears to the Planning Department to be the basic 'entitlement to use' for the property in question. The Specific Plan sets forth the manner in which the property may be developed, and basically does not involve 'The issuance of a lease, permit, license, certificate or other entitlement to use', as such. While the Tentative Tract approval may be construed to involve 'The issuance of a lease, permit, license, certificate or other entitlement to use', it is our opinion that the 'greater degree of responsibility and control' is contained by zoning approval."

Numerous comments and extensive criticism of the draft EIR and the County's addendum were received by the County. These comments, besides challenging the accuracy of certain aspects of the report, raised numerous and serious questions regarding the unavailability of water and the inadequacy of current data to determine the effect of the development on the water supply, potential ground water pollution, inadequate geological surveys and the fact that the development site is directly over the San Andreas Fault and is adjacent to several other faults, the inadequacy of current electrical facilities, the inadequacy of the only road leading to the valley, safety hazards in case of fire, erosion of the soil, air pollution damage to the trees, the historical and archeological value of the area, overpopulation, adverse effects on the surrounding youth camps and the combined effects of the development with other anticipated developments in the area.

Upon receiving these comments the planning department prepared a five-page addendum to the draft EIR. It also prepared a two-page "environmental impact summary" which merely contained one-paragraph statements of the major impacts on population, water supply, sewage disposal, air pollution, geologic hazard, wildlife and access-circulation. On October 1, 1973, the board of supervisors ordered the two-page summary to be made a part of the final EIR. The final EIR also had attached to it the comments and objections of the various public agencies and private groups which had considered the draft EIR. Neither the planning department's five-page addendum nor the two-page summary contains a response by the County to the significant environmental issues raised, nor do they address in any detail the reasons why the specific comments and objections received from the interested agencies and private groups were not accepted, and why the board apparently concluded that the value of the development warranted an override of the environmental objections.

On October 1, 1973, members of the public appeared before the board. They presented additional comments and objections and pointed out that the EIR did not respond to their comments and objections as required by law. Nevertheless, the board approved the final EIR and adopted an ordinance granting Eastco the zoning change. On October 3, 1973, the County filed a notice of approval of the project as required by Public Resources Code section 21152. Thereafter the County issued a grading permit which permitted Eastco to grade the land and remove trees.[6] By affidavit, Eastco

---

[6]The County's return states that the County "knows of no work ever done under that grading permit," and alleges that the grading permit expired December 3, 1973. Eastco, on the other hand, alleges that it was "commencing construction of the roads which had already been surveyed when the present suit was filed." Eastco also alleges that it has drilled a well on the property pursuant to a County permit.

states that since it purchased the property in 1971 and up to the filing of the superior court action on November 2, 1973, it had expended in excess of $45,000 for architectural and engineering costs and fees, and other expenses incurred in connection with the development of the property.

## DISCUSSION

Both the County and Eastco contend that by virtue of the approval of the tentative maps and the adoption of the specific plan Eastco acquired a vested right to continue with the project, unimpeded by any future action by the County pursuant to its police power. They argue that the approval of the project actually occurred at the time the tentative maps were approved; that under a well-established custom and practice in Kern County the rezoning of the property as required by the tentative maps was purely a ministerial act; and that the County had no discretion to deny their application for rezoning or to deny issuing a building permit for the construction of the project.

In making this contention, the County and Eastco ignore state law (Gov. Code, §§ 65800-65912) and the County's own zoning ordinance, which make the rezoning of property a discretionary act of the local legislative body. Under the law the adoption or amendment of a zoning ordinance requires a public hearing and a recommendation by the planning commission to the legislative body; if the planning commission has recommended the adoption or amendment, the legislative body is required to hold a public hearing following which it "may approve, modify or disapprove the recommendation of the planning commission . . . ." (Gov. Code, §§ 65854, 65855, 65856, 65857; see also § 7279(b), Land Use Zoning Ordinance, County of Kern.) Additionally, the Zoning Ordinance provides that at the request of any interested person the vote of the board of supervisors on any application for an amendment or change of zone shall be deferred until such time as all members of the board are present and have had an opportunity to vote thereon. (§ 7279(c), Land Use Zoning Ordinance, County of Kern.) The ordinance further provides "[n]o permit or license shall be issued for any use involved in an application for an amendment or change of zone until same shall have become final by the adoption of an ordinance." (§ 7279(b), Land Use Zoning Ordinance, County of Kern.)

These provisions make it abundantly clear that the County retained discretion to approve or disapprove the application for the zone change, and that the previous approval of the tentative map and the specific plan

was not the final exercise of the County's authority over the project. As stated in *Kappadahl* v. *Alcan Pacific Co.,* 222 Cal.App.2d 626 [35 Cal.Rptr. 354]: "The filing of a map showing streets, lots and blocks in no way prevents a county under its zoning power from changing the zoning uses . . . .

"The zoning and planning sphere does not derive from the proprietary interests of the county. It is an independent power. (Gov. Code, § 65800 et seq.) To hold that the county could be estopped from performing this function by the filing of a map would be to fly in the face of an express statutory grant. The simple act of filing a map would destroy the power of the planning commission, the zoning board and the local legislative body to *ever* permit the use of land for purposes other than those specified on the map, or as zoned at the time the map was filed. The uses to which a parcel could be put would be irrevocably fixed for all time. [Citation.] There is no indication in the Subdivision Map Act (Bus. & Prof. Code, § 11500 et seq.) that such a result was intended by the Legislature." (222 Cal.App.2d at pp. 633-634; see also *Gisler* v. *County of Madera,* 38 Cal. App.3d 303, 309 [112 Cal.Rptr. 919].)

Nor did the adoption of the specific plan irrevocably commit the County to amend the zoning ordinance. The specific plan was prepared by the planning commission pursuant to the authority contained in Government Code section 65450 et seq. to assure that the development would be in furtherance of the County's general plan. The adoption of the specific plan was made subject to the rezoning of the property to conform to the tentative maps, and Eastco was advised by the planning department that the requested zone change involved a "greater degree of responsibility and control" over the project than did the specific plan or tentative tract approvals.

Only in rare and unusual circumstances will the doctrine of estoppel be invoked against a public agency to prevent enforcement of a zoning ordinance. (See *City etc. of San Francisco* v. *Burton,* 201 Cal.App.2d 749, 756 [20 Cal.Rptr. 378]; *Donovan* v. *City of Santa Monica,* 88 Cal. App.2d 386, 394 [199 P.2d 51].) While this rule may result in harsh consequences to developers who anticipate approval, the overriding interests of the public must prevail. (*Pettitt* v. *City of Fresno,* 34 Cal.App.3d 813, 819-823 [110 Cal.Rptr. 262]; *Markey* v. *Danville Warehouse & Lbr., Inc.,* 119 Cal.App.2d 1, 6-7 [259 P.2d 19].) Accordingly, unless the owner possesses all the necessary permits, the mere expenditure of funds or commencement of construction does not vest any rights in the development. (See *Russian Hill Improvement Assn.* v. *Board of Permit Appeals,*

66 Cal.2d 34, 40 [56 Cal.Rptr. 672, 423 P.2d 824]; *Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110, 125 [109 Cal.Rptr. 799, 514 P.2d 111]; *Anderson* v. *City Council,* 229 Cal.App.2d 79, 89 [40 Cal. Rptr. 41].)[7]

■ Because the County retained discretion to deny the application to rezone the property, Eastco does not have any vested right in the development such that any future action by the County pursuant to its police power would be ineffectual.

■ Eastco next contends that under the validation provisions of Public Resources Code section 21169, effective December 5, 1972, an EIR is not required for the project. Section 21169 provides in pertinent part: "Any project defined in subdivision (c) of Section 21065 undertaken, carried out or approved on or before the effective date of this section and the issuance by any public agency of any lease, permit, license, certificate or other entitlement for use executed or issued on or before the effective date of this section notwithstanding a failure to comply with this division, if otherwise legal and valid, is hereby confirmed, validated and declared legally effective. . . ."

In interpreting section 21169, it is clear that CEQA applies to all projects which the public agency retains discretion to approve or disapprove after the expiration of the moratorium provisions. Public Resources Code section 21061 provides in part that: "An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by every public agency prior to its approval or disapproval of a project. The purpose of an environmental impact report is to provide public agencies with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which any adverse effects of such a project might be minimized; and to suggest alternatives to such a project." Section 21080 provides: "(a) Except as otherwise provided in this division, this division shall apply to discretionary projects proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps (except

---

[7]The County has cited and relied on the case of *Great Western Sav. & Loan Assn.* v. *City of Los Angeles,* 31 Cal.App.3d 403 [107 Cal.Rptr. 359], where it was held that upon approval of the tentative subdivision map, the approval of the final map was but a ministerial act so long as the developer had complied with all of the requisite conditions. That case, however, is distinguishable in that there was no issue before the court as to compliance with the applicable zoning ordinance.

where such a project is exempt from the preparation of an environmental impact report pursuant to Section 21166)." Because the County retained jurisdiction to grant or deny the application to amend the zoning ordinance and the zone change was not approved until October 1973, long after the expiration of the moratorium date, CEQA applies and an EIR was required. (See *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors*, 38 Cal.App.3d 257, 269-270 [113 Cal.Rptr. 328]; cf. *Friends of Lake Arrowhead* v. *Board of Supervisors*, 38 Cal.App.3d 497, 508-510 [113 Cal.Rptr. 539]; *San Francisco Planning etc. Assn.* v. *Central Permit Bureau*, 30 Cal.App.3d 920, 930-931 [106 Cal.Rptr. 670].)

Eastco argues that the tentative tract approval constituted the issuance of an "entitlement for use," thus bringing it within the provisions of section 21169. Under different circumstances, the approval of a tentative map may well validate a project. For example, in *Friends of Lake Arrowhead* v. *Board of Supervisors, supra,* 38 Cal.App.3d 497, it was held that the approval of a tentative tract map and a site development plan constituted an entitlement for use and validated the project where the developer had expended substantial sums in reliance upon a grading permit and a permit to construct a retaining wall and, in addition, had incurred contractual liabilities for construction and material in excess of $900,000 prior to the filing of the lawsuit. (See Pub. Resources Code, § 21170.) However, in that case, the proposed subdivision and its design was consistent with the applicable general plan and zoning for the property and thus the approval of the tentative tract map and site development were the final discretionary acts of the public agency. In the case at hand, the tentative tract approval cannot be deemed an entitlement for use because it was conditional upon the rezoning of the property.

■ We turn now to the question of whether the final EIR complied with the CEQA and the guidelines. Because petitioner in the action below is seeking to set aside and to annul the determination of the County approving the final EIR on the ground of noncompliance with CEQA, our inquiry is limited to whether there was a prejudicial abuse of discretion on the part of the County (Pub. Resources Code, § 21168.5). Under the statute such an abuse is established if the public agency has not proceeded in a manner required by law or if the agency's determination is not supported by substantial evidence.

Public Resources Code section 21153 provides: "Prior to completing an environmental impact report, every local agency shall consult with and obtain comments from, any public agency which has jurisdiction by law with respect to the project, and may consult with any person who has special expertise with respect to any environmental impact involved."

Section 15146 of the guidelines (Cal. Admin. Code, tit. 14) provides: "(a) The Final EIR shall consist of the Draft EIR containing the elements described in Sections 15141, 15142 and 15143 of these Guidelines, a section . . . containing the comments received through the consultation process described in Article 10, either verbatim or in summary, *and the response of the [responsible] agency to the significant environmental points raised in the review and consultation process.*

"(b) The response of the [responsible] agency to comments received may take the form of a revision of the Draft EIR or may be an attachment to the Draft EIR. *The response shall describe the disposition of significant environmental issues raised* (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular the major issues raised when the [responsible] agency's position is at variance with recommendations and objections raised in the comments *must be addressed in detail giving reasons why specific comments and suggestions were not accepted, and factors of overriding importance warranting an override of the suggestions."* (Italics added.)

This regulation, together with other regulations which touch on the point (see Cal. Admin. Code, tit. 14, §§ 15027, 15085(a), (d), 15143(b)-(e)) make it abundantly clear that in preparing the final EIR, the County must describe the disposition of each of the significant environmental issues raised and must particularly set forth in detail the reasons why the particular comments and objections were rejected and why the County considered the development of the project to be of overriding importance. The policy of citizen input which underlies the act (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* 27 Cal.App.3d 695, 704-705 [104 Cal. Rptr. 197]) supports the requirement that the responsible public officials set forth in detail the reasons why the economic and social value of the project, in their opinion, overcomes the significant environmental objections raised by the public. In *Silva* v. *Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285, a case decided under the analogous National Environmental Policy Act (see *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049]; *County of Inyo* v. *Yorty,* 32 Cal.App.3d 795, 807 [108 Cal.Rptr. 377]), the court explained the policy thusly: "Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to crystallize issues [citation] but 'affords no basis for a comparison of

the problems involved with the proposed project and the difficulties involved in the alternatives.' [Citation.] Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response."* (Italics added.) (See also *Environmental Defense Fund, Inc.* v. *Coastside County Water District, supra,* 27 Cal.App.3d 695, 704-705, 708; *Portland Cement Association* v. *Ruckelshaus* (1973) 486 F.2d 375, 392-394 [158 App.D.C. 308].) Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree. We conclude that the County's failure to respond with specificity in the final EIR to the comments and objections to the draft EIR renders the final EIR fatally defective.[8]

Because Eastco has announced its readiness to commence construction of the project in spite of the County's failure to proceed in the manner required by law, the trial court should have issued a preliminary injunction to preserve the status quo and to prevent the threatened irreparable injury to petitioner.

Accordingly, it is ordered that a writ of mandate issue to respondent Superior Court of Kern County directing said court to forthwith issue a preliminary injunction enjoining the County from issuing to Eastco any building permits or other entitlements for construction of the proposed project and ordering the real parties in interest to cease and refrain from taking any further action pursuant to any permit or other entitlements

---

[8]We also point out that the planning commission addendum to the EIR states: "For purposes of development, the Cuddy Valley should be considered as one unit. Developments within a portion of the Valley are not isolated but may affect the environment of others within this same valley." The final EIR makes no mention of the combined impact of these projects on the environment. Section 15069 of the guidelines provides in pertinent part: "Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, *but should in either case comment upon the combined effect."* (Italics added.) We believe the Attorney General is correct when he contends that the final EIR also should consider and comment upon the overall impact of the Rancho El Contento project and the other projects now in progress in Cuddy Valley regardless of their current state of development. (See generally *Hixon* v. *County of Los Angeles,* 38 Cal.App.3d 370, 381 [113 Cal. Rptr. 433]; *Environmental Defense Fund, Inc.* v. *Coastside County Water District, supra,* 27 Cal.App.3d 695, 706-707.)

heretofore issued or approved by the County with respect to the construction of the proposed project; said preliminary injunction to remain in force pending a trial on the merits of the action below.

Brown (G. A.), P. J., and Gargano, J., concurred.