Filed 6/12/15  Certified for Publication 7/6/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF IRVINE, | |
|    Plaintiff and Appellant, | G049527 |
|      v. | (Super. Ct. No. 30-2013-00622921) |
| COUNTY OF ORANGE et al., | O P I N I O N |
|    Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Kim Garlin Dunning, Judge.  Affirmed.

Rutan & Tucker, Todd O. Litfin, Jeffrey Melching and Ann Levin for Plaintiff and Appellant.

Nicholas S. Chrisos, County Counsel, Jack W. Golden, Chief Assistant County Counsel and Nicole M. Walsh, Deputy County Counsel for Defendants and Respondents.

\*           \*           \*

## I.  INTRODUCTION

This is the third effort by the City of Irvine to stop a proposed expansion of the James A. Musick Jail Facility (the Musick Facility, sometimes called the Musick jail expansion) to reach this court.  In *City of Lake Forest et al. v. County of Orange* (Dec. 8, 2000, G023884) [nonpub. opn.] (*Musick I*), the cities of Irvine and Lake Forest challenged the 1996 certification of an environmental impact report, "EIR 564," involving a proposed expansion of the Musick Facility from about 1200 inmates to 7,584 inmates.  Four aspects of EIR 564 were targeted in *Musick I*:  (1) the loss of agricultural land attendant on the change of the facility from an "honor farm" to a relatively large jail facility; (2) the impact of the project on air quality; (3) the extra burdens on local government services in the area because of a need for extra police patrols and ambulances; and (4) the cumulative impact of the project in light of the planned – at the time – reuse of the adjacent El Toro Marine Air Station (the El Toro Base) as an international airport.  In *Musick I* this court overturned a trial court decision finding EIR 564 inadequate.  We held EIR 564 did indeed adequately disclose the impacts of the project.  The 1996 project, however, did not go forward because the County did not consider it had the financial resources for it.

A decade or so later came the Realignment Act of 2011 (see Stats. 2011, ch. 15, §§ 1, 450) which shifted responsibility for the custodial housing and post-release supervision of some felons from the state prison system to local jails and probation departments.  (See *Wofford v. Superior Court* (2014) 230 Cal.App.4th 1023, 1032.)  Concomitant with realignment legislation was passed making it easier for local government agencies to obtain state funds to build more local jail cells.  (See *City of Irvine v. County of Orange* (2013) 221 Cal.App.4th 846, 852 (*Musick II*).)  The prospect of new funding revived the County's plans for the Musick jail expansion, and the County applied for state funds for the project.  Irvine reacted by challenging the County's *application* for state funding of the expansion without a new EIR, even though the

2

County, at roughly the same time as the application, had certified a supplemental EIR ("SEIR 564") dealing with the project in light of planned intervening changes in surrounding land uses. (See *Musick II, supra*, 221 Cal.App.4th at pp. 852-853.) In *Musick II*, this court concluded there was no need to prepare an EIR (or other appropriate environmental impact document) *prior* to merely applying for funds. (*Id*. at pp. 863-865.)

We now come to *Musick III* – this case – in which Irvine directly challenges SEIR 564. The project is still for 7,584 inmates, though there is a minor reconfiguration of the actual jailhouse to be built. And some land, about 22 acres, that was going to continue to be farmed back in 1996 has been dropped for open space. There has been one big intervening change in surrounding land use, which is the scrapping of the proposed international airport at the former El Toro Base in favor of a "Great Park," with some adjacent housing development.

In *Musick III*, Irvine presents several challenges to SEIR 564 that basically center on only two actual environmental effects: impacts on local traffic intersections and the loss of agricultural land. It turns out the problem of ascertaining the effect of the project on local traffic is a problem of variable phasing. The project depends on state funding, and can only proceed as state funding becomes available, but that complicates the task of gauging the precise marginal interim effects on local traffic on an intersection-by-intersection basis. Irvine would have us hold that the County was obligated to calculate year-by-year, intersection-by-intersection, traffic impacts that would take into account all the various permutations derivable from the variables of project phasing and nearby residential construction in the Great Park area. That is not required. As we explain below, the Supreme Court's opinion in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439 (*Metro Line*) demonstrates that what Irvine did here – two traffic studies using baselines for traffic conditions in 2014 and 2030 – was sufficient. And if not sufficient, not prejudicially insufficient.

3

As to the loss of agricultural land, the topic is well-trod territory in a county where there are few orange groves left and the cost of land makes commercial agriculture largely cost prohibitive. The County had discovered it was even too costly to grow its own food by 2009, so there is now no actual agriculture at the Musick Facility. Irvine quibbles with the conclusion of SEIR 564 that it is now virtually impossible to find 65 acres of prime agricultural land in Orange County to replace the 65 acres that used to be farmed at the Musick Facility. As we explain, SEIR 564 more than adequately documented that the cost of land near the project site was $2 million per acre in 2012, and that was prior to the recovery from the Great Recession. (And the County average exceeds $308,000 per acre.) But agriculture is not competitive if the cost of land exceeds $60,000. Replacing what used to be farmed at the Musick Facility can't be done at anything near a reasonable price.

All these considerations compel us to the conclusion SEIR 564 is legally unobjectionable.

## II. FACTS

The Musick Facility consists of about 100 acres of unincorporated land in Southern Orange County. Figure 5-1 from SEIR 564, reproduced below, taken from part of the traffic study in the report, nicely encapsulates its location in the county. As the airstrip markings in the upper left-hand quadrant of Figure 5-1 show, the land is almost due east of the old El Toro Marine Base (the airstrip markings), which is now the Great Park area. When the Great Park and surrounding housing is finally built, the Musick Facility will represent a northeast boundary of Irvine. To the immediate north is hilly terrain (as indicated by the relative scarcity of street markings), and to the south is the City of Lake Forest. The numbers on the map represent traffic intersections studied in SEIR 564.

4

Exhibit 3



L S Λ

LEGEND

**1** - Study Area Intersection

------- - Future Roadway (Under Construction)

(N)

| 0 | 2000 | 4000 |

FEET

FIGURE 5-1

*Musick Jail Expansion*

Project Location and Study Area Intersections

I:\DMJ0801\G\Location&Ints.cdr (4/10/12)

AR000196

The Musick Facility began in 1964 as an honor farm designed to allow inmates to work off sentences by doing agricultural work. The farm gave inmates the chance to do productive work, and at the same time grow food for the County's main jail plus other County facilities, such as the Orangewood Children's Home. Of the 100 acres at the site, 55 were "prime" farmland, and another 10 were farmable.

By 1986, all 65 acres were in agricultural use. But the bucolic quality of the honor farm was destined to change. That year, the County prepared EIR 447 in relation to what is, in hindsight, a very modest expansion of the facility to accommodate 1,535 inmates by 2000. EIR 447 was never challenged in court. The document disclosed even then that all 65 acres of agricultural land on the site would eventually be lost to agriculture.

The proposed expansion to 7,584 inmates was a product of the mid-1990's. EIR 564 was prepared in 1996 in that regard. The document came in at 244 pages. EIR 564 was litigated in *Musick I*. The main jail facilities contemplated by the expansion were to consist of three complexes, each with octagonal modular housing components that would take up most of the 100 acres – save 22 in the southeast corner that might still be farmed by low-risk inmates. Irvine and Lake Forest challenged EIR 564, and the trial court found it deficient in four ways: on the loss of agricultural land, air quality, government services and overall cumulative impact. This court, however, reversed on all four points: EIR 564 did, indeed, disclose an irreversible net loss of agricultural land. (At the time, some 33 "prime" acres were still being farmed at the Musick Facility, as we explained in *Musick I*). EIR 564 recognized that the project would create additional nitrous oxide emissions since the project would mean numerous daily trips of about 14 miles, but those would be spread out over a large area. EIR 564 further recognized the need for extra police patrols, but to the effect the project posed the threat of increased crime in areas near the jail, we held that is the sort of socioeconomic impact not covered by CEQA. And it sufficiently analyzed the project in relation to the proposed reuse of

the El Toro Base as an airport.  Meanwhile, during the pendency of the appeal, the County recirculated newly revised sections of EIR 564 dealing with the loss of agricultural land.

This court reversed the trial court's findings as to the inadequacy of EIR 564 in *Musick I*, but the project still languished for another 11 years.  In the meantime, voters in Orange County rejected the use of El Toro Base as an airport in favor of the use of the land as a "Great Park."  (See *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 180.)

So readers can get a sense of proportion between the Musick Facility expansion and the Great Park project, we reproduce Figure 3-6, from the section of SEIR 564 which discusses surrounding land uses, including the Great Park development:



7

(Readers should note that Figure 3-6 is a picture of Irvine's proposals for the Great Park area in 2002.  Since then there have been some changes.  We reproduce that figure because it graphically illustrates the size relationship of the Musick Facility to the Great Park area.)

With or without the Great Park, the Musick jail expansion project did not go forward.  Then, as we explained in *Musick II*, realignment came, and with it the prospect of state funding.  Though not directly discussed, the litigation before us now was adumbrated in *Musick II*, where we noted that in August 2012, in the wake of its application for realignment funds, the County released a supplement to EIR 564, SEIR 564.  SEIR 564 takes up 1,455 pages by itself, and its basic focus is the changes since EIR 564.  The County certified SEIR 564 in December 2012, prompting Irvine to file this lawsuit, which was pending at the time the appeal in *Musick II* was decided.  Since *Musick II* dealt with the argument that *some* sort of EIR or other "CEQA document"[1] was required prior to the County's application for funding, we may now pick up the story where *Musick II* left off.

While the 2012 SEIR 564 envisions the same expansion to 7,584 inmates as did 1996's EIR 564, the new plan proposes a large H-shaped building in the middle of the 100 acres, with a series of smaller auxiliary buildings on the periphery of the H building, with open-space areas where EIR 564 retained 22 acres for inmate farming.  Why no agriculture?  The County's inmate agricultural programs at the Musick Facility were discontinued by 2009 as a result of "budget constraints," and SEIR 564 notes that since 2000, administrative and personnel costs had significantly eaten into whatever savings was being achieved from inmates growing County food.  SEIR 564 spends 10 pages discussing 7 possible mitigation measures for the loss of the agricultural land (about which more in part III).

---

[1]     CEQA is also known as the California Environmental Quality Act, Public Resources Code section 21000 et seq.

8

Irvine filed this action seeking a writ of mandate to invalidate SEIR 564 in January 2013. The trial court rejected Irvine's arguments, finding:

(1) The changes in the project since EIR 564 (including ceasing all agricultural operations and changing three complexes to one big one) were nicely laid out in a summary of changed items in SEIR 564, and these hardly envisioned a new project requiring a brand new EIR.

(2) The County's responses to Irvine's formal comments on SEIR 564 were adequate and certainly proportional to their significance.

(3) The traffic study was adequate.

(4) The examination of the untenability of the mitigation measures for the loss of the farming operation was itself sufficient.

A formal judgment denying Irvine's requested writ was filed November 8, 2013, notice of entry of that judgment was filed November 13, 2013, and Irvine filed its notice of appeal as of January 10, 2014.

## III. DISCUSSION

In litigation attacking an EIR, the ultimate question is whether the certification of the document was a prejudicial abuse of discretion. (Pub. Resources Code, § 21168.5; e.g., *City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341, 355; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 672 [shifting project description meant public and decisionmakers "were not adequately informed about the full scope and magnitude" of the project and therefore certification was prejudicial abuse of discretion].[2]) Abuse of discretion is statutorily defined as either not proceeding in a "manner required by law" or a "determination or decision [] not supported by substantial evidence." (§ 21168.5, e.g., *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265 ["We review CEQA

---

[2] All undesignated statutory references in this opinion are to the Public Resources Code.

9

decisions to determine if they are supported by substantial evidence in the record as a whole (§ 21168), and whether the agency abused its discretion by failing to proceed in a manner required by law."].)

As noted above, Irvine has presented its formal challenge to SEIR 564 by way of four main arguments: It shouldn't have been a "supplemental" EIR at all, the County's responses to certain of Irvine's "comments" were inadequate, it didn't properly account for intervening effects on local traffic in the period prior to completion, and it inadequately demonstrated that the loss of agricultural land as part of the project could not be mitigated.

In terms of sheer space, Irvine's main focus is on its second argument, the asserted inadequacy of the County's responses to Irvine's comments on draft SEIR 564. However, we are going to consider that issue last because of the interrelationship between a lead agency's responses to comments and the way an EIR treats the merits of various environmental issues. For example, in *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 879 (*Eel River*), the court observed that a response to a comment was adequate where the response referred to a more extensive discussion of the topic in the EIR itself. To the same effect is *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 378 (*Eureka Citizens*) ["Satisfactory responses to comments may also be provided by reference to the EIR itself."].) Put another way, sometimes one can better understand the adequacy of an agency's response to a comment by first understanding what an EIR already says about the topic covered by that comment.

A. *"Supplemental" Versus "Subsequent"*

Irvine argues a "supplemental" EIR was not good enough; the County should have begun anew with a "subsequent" EIR. There is an immediate anomaly to be recognized in the County's position here: EIR 564 in 1996 went only 244 pages. SEIR – a supposed "supplement" – goes 1455 pages, or is about six times heftier. Some

10

"supplement." It's longer than the first edition of War and Peace in the original Russian (1225 pages). But it has more pictures.

Interestingly, the statute on point, section 21166,[3] treats supplemental and subsequent EIRs in the same category: If there's already an EIR, and there are no "substantial" changes to the project, or surrounding circumstances, or new information since that existing EIR, there is no need to prepare either a subsequent or supplemental EIR. One must go to regulations, often referred to as "CEQA Guidelines" prepared by the state Resources Agency,[4] to find the distinction between "supplemental" and "subsequent" EIRs.

CEQA Guideline 15162 covers "subsequent" EIRs.[5] CEQA Guideline 15163 covers "supplemental" EIRs. The basic rule is that whenever there is an already approved EIR and a "substantial" change in either the project, the surrounding circumstances, or new information that couldn't have been discovered when the first EIR was prepared, either a "subsequent" *or* a "supplemental" EIR must be prepared. The only difference is that, as explained in CEQA Guideline 15163, if there has been a substantial change, which would otherwise require a "subsequent" EIR under CEQA Guideline

---

3    Which we reproduce now:
"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:
"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.
"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.
"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

4    See *Communities For A Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, footnote 4 ["The regulations guiding application of CEQA, found in title 14 of the California Code of Regulations, section 15000 et seq., are often, and will sometimes be here, referred to as the CEQA Guidelines."].
We will refer to all regulations found in title 14 of the Code of Regulations by their "CEQA Guideline" section number.

5    Subdivision (b) of which provides: "If changes to a project or its circumstances occur or new information becomes available after adoption of a negative declaration, the lead agency shall prepare a subsequent EIR if required under subdivision (a). Otherwise the lead agency shall determine whether to prepare a subsequent negative declaration, an addendum, or no further documentation."

11

15162, but "[o]nly minor additions or changes would be necessary to make the previous EIR adequate to apply to the project in the changed situation," then the lead agency has the discretion (the key phrase is "may choose") to prepare a "supplemental" EIR that "need contain only the information necessary to make the previous EIR adequate for the project as revised." Regardless, the supplemental EIR must still be "given the same kind of notice and public review" as an initial draft EIR.[6]

Irvine cites us to no case that actually holds that a lead agency's choice to prepare a "supplemental" EIR, when a "subsequent" EIR might arguably have been more appropriate, was fatal to the "supplemental" EIR. The case Irvine most relies on its opening brief, *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99 (*Save Peninsula*), was a case that found a supplemental EIR inadequate on its own terms because it failed to establish a realistic "baseline" of water usage to compare with that contemplated by a 100-plus unit residential development in an area known for water shortages. (See *id.* at pp. 108-109, 112, 123.) *Save Peninsula* shows that a supplemental EIR might fail on its own merits, but it certainly does not stand for a rule that requires this court to find SEIR 564 legally inadequate merely because it bears the title "subsequent" instead of "supplement."

---

6    Guideline 15163 provides in its entirety:
"(a) The lead or responsible agency may choose to prepare a supplement to an EIR rather than a subsequent EIR if:
"(1) Any of the conditions described in Section 15162 would require the preparation of a subsequent EIR, and
"(2) Only minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation.
"(b) The supplement to the EIR need contain only the information necessary to make the previous EIR adequate for the project as revised.
"(c) A supplement to an EIR shall be given the same kind of notice and public review as is given to a draft EIR under Section 15087.
"(d) A supplement to an EIR may be circulated by itself without recirculating the previous draft or final EIR.
"(e) When the agency decides whether to approve the project, the decision-making body shall consider the previous EIR as revised by the supplemental EIR. A finding under Section 15091 shall be made for each significant effect shown in the previous EIR as revised."

12

Two points are salient, though. One, as CEQA Guideline 15162's "may choose" language shows, the choice to proceed by way of a "supplemental" as distinct from a "subsequent" EIR is a discretionary one with the lead agency, thus tested under a reasonableness standard. Two, as shown recently by *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1047-1048 (*Treasure Island*), the appropriate judicial approach is to look to the substance of the EIR, not its nominal title.[7] (Accord, *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 271, fn. 25 ["The fact that this EIR is labeled a 'project' rather than a 'program' EIR matters little for purposes of this inquiry. 'The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" . . . rather than any semantic label accorded to the EIR.'"].)

With these thoughts in mind, we conclude the County did not abuse its discretion in choosing to use EIR 564 as a platform for SEIR 564 instead of beginning from – so to speak – the ground up. Actually, the word "platform" doesn't do the sequel to EIR 564 justice. The literary relationship between the two documents is more like introductory novella to large novel. EIR 564 is The Hobbit to SEIR 564's Lord of the Rings.

The actual construction project – expansion of the Musick Facility to 7,584 beds – remains the same. The land affected remains the same. The building configuration is close to the same (a single "H" building instead of three complexes with octagonal modules), as are some miscellaneous support buildings and parking structures. EIR 564's plans for a multilevel parking structure were dropped for a less-intensive at-grade design. It appears the biggest change to the actual project qua project as envisioned

---

7   Here is the relevant passage: "CSTI's contention that the EIR was improperly prepared as a 'project EIR' instead of a 'program EIR' *improperly focuses on the EIR's title rather than its substance. There are many different names that have been applied to EIRs*. For example, there are project EIRs . . . program EIRs . . . staged EIRs . . . master EIRs . . . subsequent EIRs . . . focused EIRs . . . and supplemental EIRs . . . . [¶] For this reason, *courts strive to avoid attaching too much significance to titles in ascertaining whether a legally adequate EIR has been prepared for a particular project*." (Italics added.)

in EIR 564 in 1996 is dropping 22 acres from direct agricultural use and instead devoting them to open space.

As for surrounding circumstances, there is of course the substitution of a park and some surrounding residential development for a busy airport. However, no less than 89 pages of SEIR 564 – to put that in perspective, more than a third of the original EIR 564 – are devoted to post-2000 changes in the area, including projections of traffic patterns that, trading an airport for a park and residences, would obviously be different than they might have been in 2000. We see no abuse of discretion in the County's perception that the change of use of a discrete area of nearby land should only merit a "supplemental" treatment, especially when one realizes the Great Park represents a far less intensive land use than the international airport anticipated when EIR 564 was prepared.

B. *Traffic Studies*

SEIR 564 includes a traffic study projecting morning and evening rush hour effects of the project – called "LOS" or "levels of service" – on 24 local intersections in the year 2014 (the "interim year") and in the year 2030 (projected completion of all 7,854 beds). Irvine presents its argument regarding SEIR 564's analysis of impacts on local traffic by focusing on the problem of what SEIR 564 called the "interim year," i.e., 2014. Actually, events have overtaken the word "interim." SEIR 564 was finalized in 2012. The year 2014 functions in SEIR 564 as a de facto baseline of existing conditions.

If we understand Irvine's argument correctly, it goes like this: Irvine first asserts that SEIR 564 is inconsistent in its descriptions of project phasing. In one place, the document recounts the various construction activities that will constitute "Phase I" of the expansion, and those activities entail the construction of "up to" 1,024 beds by 2018. Then Irvine notes that there is evidence in the administrative record (not in SEIR 564 but in the form of an exhibit to a County staff report giving a from December 2011 giving a timetable for the project) to the effect that County knew construction of Phase I wouldn't

14

even begin until 2015.  But, says Irvine, SEIR 564 still uses 2014 as an "interim" year in its studies of traffic and air quality impacts.  And further, when Irvine asked for a comment on these timing discrepancies, the County admitted that the earliest true "interim" year given delays in the project – that is, when 1,024 beds will have been added, is now 2018.  However, the County didn't update its traffic analysis, which was still pegged to 2014.  Irvine then cites *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438 (*Santee*) [finding EIR's description fatally uncertain], and concludes this demonstrates that SEIR 564 is based on a fatally unstable description of the project.

The problem with this argument is that it confuses the need for a stable *project description* with the task of ascertaining the interim traffic impacts of project *construction* as that construction takes place – on a timeline that cannot be predicted with certainty.  No one would dispute the need for an EIR to give decisionmakers and the public "an accurate, stable and finite project description."[8]  But gauging the exact effects of construction and partial completion of a project on a year-by-year basis when there is some play in the scheduling is a different matter.

Because *Santee* is the case Irvine relies on most, and because it also involved a city opposing a county jail in its own backyard, an examination of that case seems the best way to show the difference between the two matters here.  *Santee* arose out of a crisis precipitated in the late 1980's by the closure of a jail facility in one area of San Diego County, Vista.  The county responded by proposing to expand an existing facility at Las Colinas near the city of Santee.  But the expansion project was supposed to be temporary.  It was only going to last seven years.  (*Santee, supra*, 214 Cal.App.3d at p. 1446.)  So the EIR totally omitted *any* environmental impacts after the expected

---

8  The phrase first appeared in *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193 (*Inyo*).  In fact, a stable and accurate description of a project is the "sine qua non" of an EIR.  (See *id*. at p. 193 [first use of expression]; *Santee, supra*, 214 Cal.App.3d at p. 1454 [quoting *Inyo* in context of finding EIR description of project to be fatally unstable]; *Treasure Island, supra*, 227 Cal.App.4th at p. 1052 [most recent quote as of this writing].)

15

termination of the temporary expansion. That omission, said the appellate court, meant the EIR didn't really provide a stable description of the project, particularly since there was some indication the county was going to need the expanded facilities after the seven years had expired. (*Id.* at p. 1454.) The EIR had to be redone.

It is worth noting, though, that the ostensible win for the city in *Santee* was pyrrhic. The appellate court recognized that the deficiencies in the EIR *all* related to "future activities that the EIR failed to address." But, since the seven years hadn't yet expired, the court held the county could continue to use the "temporary male detention facility at Las Colinas" while the new EIR was developed. Continued work on the project would *not* offend CEQA. (*Id.* at pp. 1455-1456.)[9]

In the present case, however, we have a stable *project* description. This is therefore not *Santee.* Irvine urges a model of CEQA that would require continuously updated projections of traffic impacts adjusted for any delays in construction in the project or nearby areas. Ironically, the main case it cites for the need for such updating, *Metro Line, supra,* 57 Cal.4th 439, actually illustrates the *adequacy* of SEIR 564 in this case.

*Metro Line* involved a project that was *itself* proposed to alleviate traffic, namely the construction of a Westside Los Angeles light rail line. The EIR for the project, finalized in 2009, used as its "baseline" to measure environmental effects of the project the year 2030, when population growth could be assumed to make ambient traffic and air pollution *without* the project much worse. (See *Metro Line, supra*, 57 Cal.4th at p. 447.) The total omission of existing conditions was error. *Existing* conditions are the normal baseline for measuring a project's effects (*id.* at p. 448), and using "future conditions" as the *sole* baseline is a departure from the norm that requires justification based on unusual facts and circumstances (*id.* at pp. 451-452), including circumstances

_____

[9]      And in fact there's a detention facility there still. (See *In re G.L.* (2014) 222 Cal.App.4th 1153, 1157.)

16

showing that using existing conditions would be affirmatively misleading, or at the very least, "without informational value." (*Id*. at p. 457.) In *Metro Line*, using a date 21 years into the future (2030) as a baseline for an EIR finalized in 2009 could not be justified because there was no substantial evidence that using existing conditions was either misleading or without informational value (see *id*. at pp. 460-463).

However, the victory for project opponents concerning the omission was again – shades of *Santee* – pyrrhic. The high court went on to hold that the EIR's exclusive use of future conditions was *not* prejudicial, because the EIR did include an extensive analysis of year 2030 effects showing no significant adverse impacts. (*Metro Line, supra*, 57 Cal.4th at p. 463.) If the same analyses had been "performed against existing traffic conditions," the result would not have been "substantially different." (*Ibid.*) The same could be said for air quality. And since the project would have a beneficial environmental effect as soon as it started operations by reducing vehicle miles traveled, using a later baseline "was thus an insubstantial, technical error that cannot be considered prejudicial." (*Ibid.*)

The present case does not involve the mistake made by the light rail authority in *Metro Line*. SEIR 564 presents detailed traffic analyses on levels of service at area intersections for what is, substantively, a year reflecting existing conditions (2014 for an EIR finalized in 2012) and the year of projected completion (2030). The only discrepancies to which Irvine points are functions of delays in the project, and those relate to traffic – by definition a fluid condition – and not the project itself.

Irvine points to a passage in *Metro Line* that notes the need of decisionmakers and the public to know the "short- and medium-term environmental costs" of achieving a given improvement, rather than just conditions at completion in the future. (See *Metro Line, supra*, 57 Cal.4th at p. 455.) But the passage most assuredly does not require multiple, intersection-by-intersection, studies of traffic impacts on all nearby intersections on a year-by-year basis, plugging the multiple variables of not only

17

the completion of the project itself, but of any nearby projects.[10] The context of the discussion in *Metro Line* was part of a demonstration that *existing conditions* should be the default baseline for measuring environmental effects. The point was: An EIR cannot omit the impact on *current* conditions because the public and decisionmakers are entitled to know the interim environmental costs of achieving a desirable improvement, not merely the costs at the end of the road. Or, as Justice Liu put it in his separate concurring and dissenting opinion, the public and decisionmakers are entitled to know if "the short-term pain is worth the long-term gain" promised by the project. (*Id*. at p. 480 (conc. & dis. opn. of Liu, J.).) Here, the information for drawing that conclusion was provided.

Finally, even if Irvine were correct, any failure to "update" the traffic impact studies would, under *Metro Line*, be non-prejudicial. In *Metro Line*, the analyses of projected conditions in the year 2030 *alone* established that using current conditions as a baseline would not have yielded substantially different results. Here, the public and decisionmakers were given not just one, but two sets of comparison years – the beginning of the project (2014) and the completion (2030). And when one compares both of them, *Metro Line's* point about harmlessness applies all the more. The analysis for 2030, in fact, was able to predict slightly less traffic congestion over 2014, given certain improvements in local traffic conditions projected to be completed in the interim. If the omission of the use of existing conditions in *Metro Line* was an "insubstantial, technical error," any discrepancies here resulting from delay in start dates also qualify as insubstantial and technical errors.

C. *Loss of Agricultural Land*

SEIR 564 discusses seven possible mitigation measures for the loss of the agricultural land represented by the Musick jail expansion. None of the proffered measures were found feasible, and Irvine challenges SEIR 564's findings as to three of

---

10 For example, suppose an already approved residential housing development in the Great Park areas is itself delayed.

those findings: (1) the purchase of conservation easements on *existing* agricultural land to prevent it from being used in the future for nonagricultural purposes, (2) a transfer of development rights program (sometimes called TDRs), and (3) a "right to farm" ordinance.

Preliminarily, we should note that the rejection of the most obvious mitigation measure to preserve land for agricultural use – namely, simply going out and buying land to replace what has been lost to agriculture – is not challenged. That's important, because, as a response to Irvine's various objections on the agricultural mitigation issue made clear, land in the vicinity of the project was going for $2 million three years ago (in 2012, the year SEIR 564 was finalized). The obvious point, which is minimized in Irvine's briefing, is that the cost of raw land in Orange County is exorbitant, so finding 65 acres, or 55, or even 22 acres to replace farmland that, up to 2009, was farmed by inmates trying to work off jail time, is cost-prohibitive. The proposed mitigation measures must necessarily be viewed in the light of that overarching fact.

*Conservation easements*: Even in the Central Valley, there are times when agricultural conservation easements or "ACEs" are not feasible, as recently shown in *Friends of King River v. County of Fresno* (2014) 232 Cal.App.4th 105 (*Friends of King River*). That case involved a proposed aggregate mine of some 898 acres east of Fresno. The EIR recognized that about 600 acres of farmland would be permanently lost, even given a 100-year lifespan for the project. (See *id*. at p. 121.) While the EIR did recommend some minor mitigation measures (maintaining existing agricultural use outside the "surface disturbance boundary" for the 100-year life of the project and reclaiming used up "mine cells"), the EIR rejected ACEs because they would not actually affect the amount of farmland permanently lost. (*Id*. at pp. 122-123.) The reason, if one thinks about it, is obvious: An ACE is predicated on the idea that some land *now* in agricultural use will *remain* in agricultural use for the indefinite future because of the

19

ACE.  And, while an ACE might, in theory, be placed on land currently in *non-agricultural use* – say, just barren desert – such a placement is not likely to replace permanently lost agricultural land because of the likelihood that if the land were suitable for agriculture, it would already be in agricultural use or already have been converted to some more intensive use than agriculture, such as a housing tract.

And if, as in *Friends of King River*, ACEs do not replace lost farmland in the Central Valley, they certainly are not going to do so in Orange County.  In Orange County, the sheer astronomical expense of land supports the finding of SEIR 564 that the purchase of ACEs is a non-starter.  Owners of what little agricultural land is left know the value of that land if developed.  The reasonable inference is that the purchase of a conservation easement means paying a large percentage of the market value of the land, so much so that this mitigation measure would be the functional equivalent of trying to buy land not already in agricultural use and convert it to agricultural use.

Further, as pointed out elsewhere in SEIR 564 and in the County's response to questions on the point, converting land not currently in agricultural use to agricultural use carries its own adverse environmental effects, such as the creation of dust, odors, pesticide use and machinery noise.

Nor does the idea work as to *existing* agricultural land.  As SEIR 564 points out, conservation easements have historically only worked in counties where the general plan and zoning laws already set aside land for exclusive agricultural use, and Orange County has no land use designations requiring land to be devoted exclusively to agricultural purposes.

*TDRs*:  The TDR approach appears, if anything, to be even less viable.  A TDR is itself conceptually easy to understand:  If the law permits, an owner who *can* develop a given property trades that right, or parts of that right, to someone who wants to develop another property. (E.g., *Mitsui Fudosan (U.S.A.), Inc. v. County of Los Angeles* (1990) 219 Cal.App.3d 525 (*Mitsui*) [building-to-parcel ratio could be exceeded by

20

purchasing unused ratios from other parcels in redevelopment district].)  The first problem with TDRs is that it requires a common legal authority that provides for the transfer, such as the redevelopment district in *Mitsui*.  But the County's own land holdings are shrinking, and there is no indication the County has land lying fallow elsewhere that would be amenable to a TDR arrangement.  But even more basic is the problem that it is the *County* that possesses the development rights in regard to the Musick Facility, so one has to ask:  *What* is to be transferred *to whom* in order to preserve agricultural land?  Any transfer of the County's rights to develop the Musick Facility would by definition scuttle the project.

*Right-to-Farm Ordinance*:  This is the least viable option of all.  As noted, SEIR 564 recognizes that the conversion of current non-agricultural land to agricultural land will itself entail significant environmental effects, including nuisance suits.  Beyond that, a right-to-farm ordinance is meaningless where no land owner *wants* to farm.  A response to an Irvine comment revealed the fact that about $60,000 per acre is currently the break-even point for the economic viability of agricultural land.  Using a substantial evidence standard of review, it is a reasonable inference that no one will want to convert land that is currently *non*-agricultural and put it to agricultural use even if they have the ostensible legal right to do so.

D.  *Comment and Response*

1.  *Background Law*

We now come to Irvine's main argument, which is that deficiencies in the County's responses to Irvine's comments on the draft SEIR 564 require a re-do of the final EIR.  The background for this argument is a 13-page, single spaced letter, dated September 24, 2012, from Sukheee Kang, then Mayor of Irvine, to the County, containing 88 items.  The letter was obviously drafted for the mayor by counsel, containing as it does a citation to Guideline 15088 and *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336 (*Preservation Action*).

21

To call all 88 items "comments" would be a misnomer.  Some are mere argumentative assertions, obviously intended to preserve an issue for litigation.[11]  Some are argumentative assertions followed by a demand for a change in the EIR.[12]  Some are the functional equivalent of one litigant's requests for production of documents to another.[13]  Some appear to be classic litigation interrogatories.[14]  And some are actually genuine questions.[15]  In this appeal, Irvine focuses on two sets of the County's responses to its comments.  One set involves the traffic studies and the other the agricultural mitigation discussion (hence we have discussed those areas already in order to give readers a better context with which to evaluate the responses).  Before we turn to the two sets, though, some background in regard to CEQA's coverage of the topic of comment-and-response is necessary.

The statutory authority requiring a lead agency to respond to "comments" is found in section 21153.  The statute is essentially a requirement that lead agencies consult with other *public* agencies – including cities that border on the project – about

---

[11]  E.g.: "6. The DSEIR also does not comply with CEQA Guideline 15150(d), which states: 'where an agency incorporates information from an EIR that has previously been reviewed through the State Review System, the State identification number of the incorporated document should be included in the summary or designation described in subdivision (c).'  That requirement has not been followed throughout the DSEIR."

[12]  E.g., "5. The DSEIR's protocol for incorporation by references does not comply with CEQA Guideline 15150.  That Guideline states 'where an EIR or negative declaration uses incorporation by reference, the incorporated part of the referenced document shall be briefly summarized where possible or briefly described if the data or information cannot be summarized.  The relationship between the incorporated part of the referenced document in the EIR shall be described.'  The DSEIR does not provide that degree of explanation/summarization.  Please revise the DSEIR to include the required level of detail."

[13]  E.g.: "2. The DSEIR repeatedly states that the Project will result in the long range expansion of the facility which would result in 7,584 beds.  However, the DSEIR is not consistently clear as to whether those beds will or will not be 'rated' as defined in the DSEIR.  Because the County has relied upon the number of beds in determining the forecasted inmate population, and relied on that inmate population in forecasting various impacts (e.g., traffic), it is important to understand whether 7,584 is the forecasted worst case inmate population, or merely a 'rated' bed count.  Please provide the requested data and accompanying explanation/analysis."

[14]  E.g.: "33. Please explain the factual basis for your assumption that traffic generation today is the same as it was in 1996.  To the extent your explanation is based on inmate population, please explain (1) the relationship between inmates and traffic generation, and (2) provide data indicating the number of inmates at the Musick Honor Farm when the 1996 conditions were ascertained."

[15]  E.g.: "25. Please indicate whether the staffing levels appearing in Table 3.B correspond with 1024 inmates or 512 inmates."

22

possible environmental fallout associated with a project.[16]  The statute was first enacted as part of CEQA in 1972 (Stats. 1972, ch. 1154), and the first case to discuss the statute emphasized its main purpose was to gather input from other public agencies.  (See *Whitman v. Board of Supervisors* (1979) 88 Cal.App.3d 397, 413.[17])

The text of the statute does not specifically require responses to the comments.  *That* requirement, rather, derives from the Guidelines promulgated by the state Resources Agency, and in particular current Guideline 15088.[18]  Guideline 15088's

---

[16]    The statute provides in its entirety:

"(a) Prior to completing an environmental impact report, every local lead agency *shall consult with, and obtain comments from*, each responsible agency, trustee agency, any public agency that has jurisdiction by law with respect to the project, *and any city or county that borders on a city or county within which the project is located* unless otherwise designated annually by agreement between the local lead agency and the city or county, and may consult with any person who has special expertise with respect to any environmental impact involved.  In the case of a project described in subdivision (c) of Section 21065, the local lead agency shall, upon the request of the project applicant, provide for early consultation to identify the range of actions, alternatives, mitigation measures, and significant effects to be analyzed in depth in the environmental impact report.  The local lead agency may consult with persons identified by the project applicant who the applicant believes will be concerned with the environmental effects of the project and may consult with members of the public who have made written request to be consulted on the project.  A request by the project applicant for early consultation shall be made not later than 30 days after the date that the determination required by Section 21080.1 was made with respect to the project.  The local lead agency may charge and collect a fee from the project applicant in an amount that does not exceed the actual costs of the consultations.

"(b) In the case of a project described in subdivision (a) of Section 21065, the lead agency may provide for early consultation to identify the range of actions, alternatives, mitigation measures, and significant effects to be analyzed in depth in the environmental impact report.  At the request of the lead agency, the Office of Planning and Research shall ensure that each responsible agency, and any public agency that has jurisdiction by law with respect to the project, is notified regarding any early consultation.

"(c) A responsible agency or *other public agency shall only make substantive comments regarding those activities involved in a project that are within an area of expertise of the agency or that are required to be carried out or approved by the agency*.  Those comments shall be supported by specific documentation."  (Italics added.)

[17]    Here is the relevant passage:  "Ideally, all public agencies exercising authority over any natural resource which conceivably might be affected by a proposed project should be consulted.  Likewise, if a city or county is the site of the project or in an area which may be subjected to major environmental effects from the projects, it should be consulted.  The public agency responsible for the preparation and certification of the final EIR should seek out those other public agencies who exercise authority over natural resources of whatever nature and provide those agencies with ample opportunity to voice objection to any proposed project.  The appropriate policy should be one of inclusion, not exclusion, of other public agencies."

[18]    Here is the complete text:

"(a) The lead agency shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response. The lead agency shall respond to comments received during the noticed comment period and any extensions and may respond to late comments.

"(b) The lead agency shall provide a written proposed response to a public agency on comments made by that public agency at least 10 days prior to certifying an environmental impact report.

predecessor, back in the late 1970's, was Guideline 15146, which, like Guideline 15088 today, required responses to the "significant" environmental points raised in the "consultation process." (See *People v. County of Kern* (1974) 39 Cal.App.3d 830, 841 (*Kern County*).) A careful reading of Guideline 15088 reveals a general mandate, in subdivision (a), to prepare a written response to "comments on environmental issues" (we note subdivision (a) doesn't say "all" comments, just "comments"). However, there is a more specific mandate, in subdivision (c), to respond in good faith and in "detail," to "*significant* environmental issues" raised in comments whenever the lead agency's position is "at variance" with the comment about the "significant" environmental issue. (See *Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852, 862 [indicating distinction between comments that address significant environmental issues and those that don't].)

On the other hand, we see nothing in Guideline 15088 that allows project opponents to use the comment-and-response process to wear down a lead agency, or delay a project, by the simple expedient of filing an onerous series of demands for information and setting up a series of hoops for the lead agency to jump through. The comments of public agencies must not only be "substantive," but also "within an area of expertise" of that agency or otherwise involve matters required to be "carried out by the agency." (§ 21153, subd. (c).) We note in this regard that, unlike the typical discovery process in litigation, the recipient of onerous demands for information by a project

"(c) The written response shall *describe the disposition of significant environmental issues raised* (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular, the *major environmental issues raised* when the lead agency's position *is at variance* with recommendations and objections raised in the comments must be *addressed in detail giving reasons why specific comments and suggestions* were not accepted. There must be *good faith, reasoned analysis in response. Conclusory statements unsupported by factual information will not suffice*.
"(d) The response to comments may take the form of a revision to the draft EIR or may be a separate section in the final EIR. Where the response to comments makes important changes in the information contained in the text of the draft EIR, the lead agency should either:
"(1) Revise the text in the body of the EIR, or
"(2) Include marginal notes showing that the information is revised in the response to comments."
(Italics added.)

24

opponent has no recourse to the courts for relief (such as a protective order or other legal device) to prevent the comment-and-response process from being abused by project opponents.

Case law has provided a few oft-repeated principles by which courts may evaluate the sufficiency of a lead agency's responses to comments: A response can be sufficient if it refers to parts of the draft EIR that analyzes the environmental impacts raised by the comment. (E.g., *Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 49 (*Paulek*); *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 686 (*Twain Harte*).) A general comment can be adequately met with a general response. (E.g., *Eel River, supra,* 108 Cal.App.4th at p. 878.) Responses need not be exhaustive. (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 937 (*Gilroy*).) And because, ultimately, responses to comments are part of the EIR itself, their sufficiency should be "viewed in light of what is reasonably feasible." (See *Twain Harte, supra*, 138 Cal.App.3d at p. 686.)

The case law dealing with actual examples of adequate and inadequate responses, however, can be a bit daunting. There is, alas, a know-it-when-I-see-it quality to the discussion of the adequacy of individual responses to individual questions.[19]

The earliest case to confront the question of the adequacy of a lead agency's responses was *Kern County, supra*, 39 Cal.App.3d 830. *Kern County* was a case involving something now practically unheard of – an EIR that went only *nine pages*. (*Id*. at p. 835.) Because *Kern County* and another relatively early case, *Cleary v. County of Stanislaus* (1981) 118 Cal.App.3d 348, are the centerpieces of Irvine's appeal on the comment-and-response issue, we discuss them now in detail.

---

[19] Indeed, if we were to apply Irvine's approach to the sufficiency of responses analyzed in the appellate opinions in this area – opinions going both ways – one wonders how many opinions would themselves be held inadequate because their discussion of the comment-and-response issue on appeal was insufficiently "detailed" and "non-conclusory."

25

*Kern County* involved a large (275 acres) subdivision project in a national forest at fairly high altitude (5,300 feet).  The Attorney General's office objected to the subdivision, in part because of serious concerns about the availability of water and the impact of the project on ground water pollution, plus the location of the subdivision: right over the San Andreas Fault.  (See *Kern County, supra*, 39 Cal.App.3d at p. 836.)  The Attorney General's comments about water and pollution were addressed in a five-page addendum and a two-page summary to the nine-page draft EIR, but neither "contain[ed] a response" by the lead agency to the "significant environmental issues raised" or addressed "in any detail" why the various comments were not accepted or why other concerns override those objections.  (*Ibid.*)   The appellate court made the point that the necessity of comments was to prevent "'stubborn problems or serious criticism'" concerning a project from "'being swept under the rug.'"  (*Id*. at p. 841, quoting *Silva v. Lynn* (1st Cir. 1973) 482 F.2d 1282, 1285.)  Reasoning that "[o]nly by requiring the County to fully comply with the letter of the law can a subversion of the important policy purposes of CEQA be avoided," the appellate court held that the "failure to respond with specificity in the final EIR to the comments and objections in the draft EIR renders the final EIR fatally defective."  (*Id*. at p. 842.)

About a decade later, another Central Valley case, *Cleary*, took *Kern County* as its inspiration, so much so that *Cleary* included a large swath of text from *Kern County* as the engine of its discussion on the comment-and-response issue.  (See *Cleary, supra*, 118 Cal.App.3d at p. 356.)  *Cleary* involved a commercial and recreational development project (pitch and putt golf, picnic area, gift shop, etcetera) over 31 acres, but several public agencies, including the state Air Resources Board, commented the EIR's discussion of air quality was "inadequate (indeed *nonexistent*)."  (*Id*. at p. 357, italics added.)  The County's response was a single paragraph saying air quality wasn't a concern because the increase in traffic from the project was insignificant.  (*Id*. at p. 358.)  Because that response was "nonspecific and general," it was inadequate.  (*Ibid.*)

26

An additional comment-and-response problem in *Cleary* was the state Food and Agriculture department's concern about the effect the project would have on surrounding agricultural land, and in particular how the project might affect the property values of nearby landowners who either had, or had not, committed their lands under long term contracts to continued agricultural use. (*Cleary, supra*, 118 Cal.App.3d at p. 359.) Those concerns elicited a mere two sentences, one of which stated the obvious – the Department of Agriculture was concerned with the effect on agriculture – and the other which said "[t]his concern" had been addressed in "'previous responses" without identifying what those responses were or how it had been addressed. (*Ibid.*)

But it was not all bad news for the lead agency in *Cleary* as to its responses either. The court distinguished *new* issues from ones already covered. The state department of Health had expressed "rather general concerns" about increased noise levels, and the appellate court noted the "element of increased noise was considered" in the draft EIR. The draft EIR had noted the project was in conformance with the noise element of the county's general plan, and that *was* sufficient. (*Cleary, supra*, 118 Cal.App.3d at pp. 359-360.) Likewise, in the ultimate de novo review, the court itself read a bundle of letters individuals had submitted about the project, and came to the conclusion none of the letters raised any "new environmental issues which the draft EIR had not recognized or which were noted in the comments" by the various state agencies. (*Id*. at p. 360.) Without further discussion of the application of the deficiencies in the responses to the air quality and agricultural land value issues – the discussion immediately segued into another issue regarding mandatory findings – the appellate court reversed the judgment of the trial court and directed the writ requested by a project opponent be issued. (*Id*. at pp. 361-362.)

A deficient response was also found in *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 (*San Joaquin Raptor*). There, the draft EIR for a 633-home plus commercial development plus park project completely

omitted acknowledgment that the project was, in fact, adjacent to a sensitive wetland. The draft EIR inaccurately said all surrounding land was agricultural. The adjacency of the wetland surfaced only because of a comment from an objector. (See *id*. at pp. 724-725) While the court didn't quote the response, the opinion made it clear the response was inadequate because it didn't allow a reader to understand the size or location of the wetlands or mention the effects of the project on the wetlands (such as the effect on the wetlands of the widespread mosquito abatement required by a nearly population center). The response, in short, left a big hole on the topic of those wetlands. (See *id*. at p. 726.)

So the cases relied upon by Irvine, and others we've found where responses to comments were inadequate seem to us to involve more serious lacunae than our case. On the other side, *Twain Harte* does provide a few clear examples of what did pass muster. *Twain Harte* concerned the EIR supporting a county's general plan. One letter writer thought the provision conditioning development on adequate available water was a bad idea because the provision gave too much power to water agencies to allow development. Another letter writer made the same point about sewer lines – it gave sanitation agencies too much power to allow development. And a third suggested a requirement that, as a mitigation measure, planning approval for water and sewer lines must be required before obtaining overall planning approval. The first two letters were not specifically responded to at all, and the third only generated a paragraph response pointing out that water and sewer companies were legally required to provide hook-ups regardless of the county's planning preferences. A response to another comment revealed that the county sent letters to the various water and sewer agencies – apparently in the form of a survey – the results of which appeared in two revised tables in the EIR. The nature of the tables and the survey was not detailed in the *Twain Harte* opinion, but the paragraph on required hook-ups and the revised tables were found sufficient because they revealed the very truth that the letters had first noted: Land use determinations

28

would be made "initially" based on the availability of water and sewer services. (*Twain Harte, supra*, 138 Cal.App.4th at p. 681.)

From the cases, we may divine a few more basic thoughts as to the application of the law to the adequacy of responses: When a comment raises a "significant" environmental issue, there must be some genuine confrontation with the issue, it can't be swept under the rug (*Kern County*). Responses that leave big gaps in the analysis of environmental impacts (such as missing entirely the existence of adjacent wetlands) are obviously inadequate (*San Joaquin Raptor*). By the same token, comments that bring some new issue to the table need genuine confrontation (*Cleary*). And comments that are only objections to the merits of the project itself may be addressed with cursory responses (*Twain Harte*).

2. *Comments and Responses Re Traffic*

Irvine propounded 88 separate "comments" to the County but, mercifully, has narrowed its appeal to only two sets of comments and responses: The first set concerns comment numbers 32, 33, 39, and 45 all dealing with the impacts on local traffic discussed above in part III.B. The second set is directed at comment numbers 61, 63, 64 and 67 involving the topic of mitigation of the loss of agricultural land, discussed above in part III.C. We begin by setting out both the comments and responses to the first set.

*Comment 32*: "Please specifically disclose the criteria and process used by the County of Orange Public Works staff to determine which additional intersections should be added to the Traffic Study area."

*Response to Comment 32*: "The project study area was based on the intersections analyzed in EIR 564. In addition, in consultation with County of Orange Public Works staff, the ramps at Alton Parkway/SR-241 were added to the analysis based on the potential for traffic to utilize SR-241 once Alton Parkway was extended."

29

*Analysis of Response to Comment 32*:  The response is adequate for three reasons.  One, the comment does not directly raise a "significant environmental issue," but merely touches on the significant issue of traffic impacts already covered by the EIR. Two, it is not really a comment at all.  It functions as an interrogatory directed to the authors of the EIR.  Three, considered as an interrogatory, the County answered the question:  Two new intersections (though one would learn that from the 2014 and 2030 traffic study tables) were added to account for traffic to and from a toll road after a connector road was extended.

*Comment 33*:  "Please explain the factual basis for your assumption that traffic generation today is the same as it was in 1996.  To the extent your explanation is based on inmate population, please explain (1) the relationship between inmates and traffic generation, and (2) provide data indicating the number of inmates at the Musick Honor Farm when the 1996 conditions were ascertained."

*Response to Comment 33*:  "The project trip generation was based on data provided by the Orange County Sheriff Department, as described and detailed in the approved EIR 564."

*Analysis of Response to Comment 33*:  As interrogatory answers go, this one at first appears to be vulnerable to the charge of being non-responsive, but that's because of the comment's own ambiguity in the phrase "traffic generation."  If one concludes that "traffic generation" refers to all the new traffic that will be associated with the development of the Great Park and its surrounding residential areas after 2000, the response obviously doesn't answer the question because the response is pegged to a 1996 document, not existing conditions.  However, the County appears to have interpreted the words "traffic generation" to refer to just the traffic generated by the expansion of the Musick Facility *itself*, and on that score the response is certainly adequate in referring to EIR 564.  That seems to us to be reasonable.  As we have noted above in our discussion of the "supplemental versus supplement" issue, the project itself is still substantially the

30

same as in 1996, and if Irvine had wanted some discussion of "new" traffic post 2000, its comment certainly didn't make that clear.

*Comment 39*: "Please explain whether and to what extent the DSEIR accounts for the programmed traffic improvements that have been added to or removed from the North Irvine Transportation Mitigation program since 2006. We request this explanation in an effort to ensure that your forecasts of future conditions (both traffic conditions and assumed improvements) are accurate."

*Response to Comment 39*: "See response to comment 28." Response to comment 28: "The latest Irvine and Lake Forest approvals at the time the supplemental traffic analysis was completed (2009) were included in the analysis. Land use changes approved by the City after that date were not included in the analysis. However, to assess the difference in project opening levels of service (LOS) between the latest ITAM and recent project approvals within the City of Irvine (including the approved Great Park Neighborhood SEIR) and the Supplemental Traffic Study for the Jail Expansion, a LOS [level of service] comparison is provided. [¶] A comparison of intersection capacity utilization (ICU) from the LSA Supplemental Traffic Analysis and the approved 2011 Heritage Fields Traffic Study is provided in Table A. As shown in this Table A, all study area intersections operate at satisfactory LOS based on the LOS criteria for both the City of Irvine and the City of Lake Forest. Although land uses and circulation network changes have occurred since 2009, the satisfactory operations of these intersections have not changed."

*Analysis of Response to Comment 39*: There are two reasons the response was adequate. First, the comment did not raise a significant environmental issue at all, it was an interrogatory directed at the draft EIR itself, not an issue. Second, as an interrogatory, it answered the question: The County used information from Irvine and Lake Forest as of 2009.

31

*Comment 45*: "Based on the recent approvals of the Great Park and Heritage Fields projects, Irvine requests that analysis of the Sand Canyon/Interstate 5 Northbound and Southbound ramps and Sand Canyon Avenue/Marine Way be included in the traffic study and DSEIR."

*Response to Comment 45*: "The project would contribute nominal traffic, if any, to Sand Canyon Avenue/Interstate 5 (I-5) northbound ramps, Sand Canyon Avenue/Marine Way, or Sand Canyon Avenue/I-5 southbound ramps. Therefore, these intersections were not included in the Supplemental Traffic Analysis."

*Analysis of Response to Comment 45*: The comment only obliquely raises an environmental issue, and not a significant one at that – the impact of the Musick Facility expansion on two traffic points along Interstate 5. The County's response qua answer *is* conclusory to be sure – the County says there's no need to consider these two points because the project would create only nominal traffic to them, and that assertion is indeed not supported. On the other hand, the comment on its face is essentially a demand for two new intersections to be included in the study, and, in SEIR 564, the criteria for which intersections rated study *were* laid out in a table involving levels of service based on information obtained from Irvine itself as well as Lake Forest. Those criteria centered on percentages of "intersection capacity utilization" (or "ICU" in the jargon), in which intersections are given grades based on the percentage of capacity utilization. SEIR 564's selection of which intersections was based on which intersections were busiest. It is a reasonable inference from the traffic tables in SEIR 564 that the two off ramps were nowhere close enough to capacity to be worth studying in traffic impacts.

3. *Comments and Responses Re Agricultural Mitigation*

The analysis of the County's responses to Irvine's agricultural mitigation comments requires a slight change in format, because the County's response was a block response to all of them. And that block is too generous to quote here. So we will first quote the four subject comments, and then provide a synopsis of the County's response.

*Comment 61*: "With regard to Mitigation Measure No. 4, the DSEIR assumes, without providing any actual data to support the assumption, that the costs of producing conservation easements would be prohibitively high. Please provide data to back up the assertion."

*Comment 63*: "In its discussion of Mitigation Measure No.4, the DSEIR assumes, without providing any data, that easement costs 'could be very high, requiring the County to find funding sources within its existing budget structure.' Please provide data to back up the assertion."

*Comment 64*: "On Page 4.12, the DSEIR speculates that it could be difficult to locate willing sellers of development rights 'in areas of escalating land values.' Not all areas of the County are currently experiencing escalating land values. Please detail whether, and to what extent, the County has made an effort to locate willing sellers of development rights."

*Comment 67*: "The DSEIR claims 'a [Transfer of Development Rights (TOR)] program would do little to mitigate for the loss of agricultural land due to the project because protecting agricultural lands offsite would not directly offset the project-related conversion of agricultural lands at the project site.' There is no apparent factual basis for this concern. The preservation of agricultural lands is a countywide issue (a fact that is acknowledged several times in the DSEIR). While preservation of agricultural lands onsite may be preferred, it is not essential to the mitigation of the impact."

*Synopsis of Collective Response to Comments 61, 63, 64, and 67*: The response to Irvine's objections to the possible mitigation avenues for the loss of agricultural land first recounted that these mitigation concerns had already been voiced by Irvine in its opposition to EIR 564 and litigated in *Musick I*. The County then noted – as we have recounted above – that by 2012 the cost of raw land in the vicinity of the project was about $2 million per acre and large scale agriculture is not economically viable after the price of land reaches about $60,000 per acre. It went on to note that water

33

costs more in Orange County than in other regions, including Oxnard and Ventura, and living costs in Orange County are also higher than competing regions, meaning the price of agricultural labor would be higher as well. The obstacles to agriculture in Orange County are further compounded by constraints that include limitations on hours of operation, limits on pesticide and fertilizer use, required setbacks from adjacent nonagricultural uses, and even the "cleanup" that is required when farm equipment is used on public roads. Add to that the fact that competition from elsewhere (including Mexico, Chile, Argentina, and the Dominican Republic – more "farm-friendly" environments) is increasingly rendering agriculture in Orange County uncompetitive. Then there's pollution from agriculture: The Musick jail expansion lies in a watershed that drains into San Diego Creek and then into Upper and Lower Newport Bay, and those water bodies have already been classified as impaired under the Clean Water Act. The response further noted the irony that the City of Lake Forest (Irvine's ally in *Musick I*) has itself made findings contemplating the eventual elimination of all agricultural uses in the city. And finally, the response recognized the straightforward policy decision of the County not to "aggressively preserve agricultural lands" (County land is shrinking, and the County has no reason to hold itself to a "different standard than it does for private developers, especially in light of the fiscal woes of state and local governments in California.")

*Analysis of Response to Comments 61, 63, 64 and 67*: All the comments were essentially different ways of attacking SEIR 564's findings regarding the nonfeasibility of proposed mitigation measures 4, 5 and 6, a topic previously covered in this already too long opinion. Beyond that, the response, as we have noted, erases any doubt about the mitigation measures. The price of raw land had gone up since the draft EIR and that price makes new commercial agriculture even more cost-prohibitive.

4. *Prejudice*

The County asserts Irvine has not demonstrated any prejudice from any arguable inadequacy of its responses. We agree. Even if the language in Guideline 15088 about the need to address comments raising significant environment issues "in detail" with "factual" support in "reasoned" and non-conclusory analysis were extended to its furthest limit, the *Legislature* has still required a prejudicial abuse of discretion to decertify an EIR. (§ 21168.5.) And *Eureka Citizens* has specifically indicated prejudice in some purported inadequacy of a response must be shown. (See *Eureka Citizens, supra,* 147 Cal.App.4th at p. 378.)

At its best, the comment-and-response process in CEQA produces a *better EIR*, by bringing to the attention of the public and decision-makers significant environmental points that might have been overlooked. After all, an EIR is an informational document (e.g., *Metro Line, supra*, 57 Cal.4th at p. 453) and when comments, such as in *San Joaquin Raptor*, reveal a significant, overlooked environmental effect, the necessity of a non-conclusory response forces decision makers to confront the real downsides to a development project. (See *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 530 ["There is a sort of grand design in CEQA: Projects which significantly affect the environment *can* go forward, but only after the elected decisionmakers have their noses rubbed in those environmental effects, and vote to go forward anyway."].)

But the comment-and-response process can also be abused. At its worst, it could become an end in itself, simply a means by which project opponents can subject a lead agency's staff to an onerous series of busy-work requests and "go fetch" demands. As Presiding Justice McConnell wrote in *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 524, the point of CEQA, "'is to inform government decision makers and their constituency of the consequences of a given project, not to derail it in a sea of administrative hearings and

35

paperwork.'"  This case is an example of the drowning in "paperwork" Presiding Justice McConnell warned about.  We find no infirmity in the SEIR.

## IV.  DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.




BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF IRVINE, | |
| Plaintiff and Appellant, | G049527 |
| v. | (Super. Ct. No. 30-2013-00622921) |
| COUNTY OF ORANGE et al., | O R D E R |
| Defendants and Respondents. | |

       The County of Orange and Highland Fairview have requested that our opinion, filed on June 12, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The requests are GRANTED.

ARONSON, ACTING P. J.

I CONCUR:


FYBEL, J.